## Commonwealth v. Yaroszeufski

*William E. McDonald, assistant district attorney,* for the Commonwealth.
*John G. McDougall,* for defendant.

LAVELLE, *P.J.,* March 18, 1991—On January 11, 1989, a Carbon County jury convicted defendant, Beth Yaroszeufski, of harassment by communication or address, 18 Pa.C.S. §5504. On the same date, the court found defendant not guilty of the summary charge of harassment. 18 Pa.C.S. §2709.

Defendant's trial counsel, Charles C. Hansford, filed timely post-verdict motions. On February 2, 1989, John G. McDougall, Esq., entered his appearance on behalf of defendant. On March 31, 1989, defendant's new counsel filed a supplemental post-verdict motion alleging numerous instances of ineffectiveness of trial counsel.

On May 3, 1989, we held an evidentiary hearing on defendant's claims of ineffectiveness. The notes of testimony of said hearing have now been transcribed and filed and we have had the benefit of both the briefs and arguments of counsel.

## FACTS OF THE CASE

On August 23, 1988, between 9:30 p.m. and 9:50 p.m., four phone calls were received at Paula Krum's residence. The first phone call was received

by Paula Krum in which a female caller asked for her husband, Joe, in a very "low" and "seductive" voice. (N.T. 18-9.) At 9:38 p.m., a second call was placed to the Paula Krum residence. and was answered by her mother, Eleanor Miley. There were no words spoken by the caller and it terminated in approximately 10 to 12 seconds. (N.T. 67.) A third call came approximately two minutes later and was answered by the victim's stepfather, Clifford Miley. There was no response to his two "hellos" and the call ended. (N.T. 79-80.)

Then, there was a fourth call at approximately 9:40 p.m. which Paula Krum and Eleanor Miley responded to simultaneously on separate phones. Paula, again, described the voice as "low, seductive type." The caller asked for the gun shop, and Mrs. Miley asked the caller if she were Mrs. Mathias. The caller denied being Mrs. Mathias and again asked if the answerer was not the gun shop. When told that the phone was not at the gun shop, the caller hung up. Paula Krum identified the caller as Beth Yaroszeufski, defendant. (N.T. 24-7.)

The prosecution presented testimony of a Bell Telephone technical expert who stated that a tracing operation had been on the Krum phone lines since July 15, 1988. He indicated that the four calls on August 23 between 9:30 and 9:50 p.m. originated at the Yaroszeufski residence phone. (N.T. 88-9.)

Chief of Police, Edward Hutto, testified, without objection by defense counsel, that defendant refused to sign a proffered "rights" form and that defendant admitted to him that she was the only female in the household on the evening at the times that the calls were made. (N.T. 111.)

Defendant testified that she recalled calling the Krum residence once on August 23, 1988. She stated that she called Joseph Krum to inquire about an

advertisement for the sale of assault guns which he placed in a newspaper. (N.T. 150.) The newspaper ad for the gun shop carried the phone number which was also the unlisted phone number for the Krum residence.

## DISCUSSION

Initially, we note that post-trial defense counsel filed his supplemental motion for new trial and/or arrest of judgment raising the deficiency of counsel issues without leave of court as required by Pa.R.C.P. 1123(a) and Carbon County Rule 315(2). The Commonwealth did not object to this filing. At the ineffectiveness hearing, we permitted counsel to move, nunc pro tunc, for allowance to file supplemental motions for new trial. On May 5, 1989 a petition for such allowance was filed and granted.

In *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987), the Pennsylvania Supreme Court addressed the standard to be used in evaluating the defendant's claim. The Supreme Court held that the ineffectiveness standard enunciated by that court in *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967), and the standard announced by the U.S. Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2054 (1984), provide an identical rule of law in this Commonwealth. *Commonwealth v. Pierce, supra.* Accordingly, in assessing defendant's claim of ineffective assistance of counsel, the first determination is whether the defendant's claim is of arguable merit. *Commonwealth v. Clemmons,* 505 Pa. 356, 479 A.2d 955 (1984). If the court determines that the issue underlying the charge of ineffectiveness is of arguable merit, it then must determine whether the course chosen by counsel had some reasonable

basis designed to serve the interests of his client. *Commonwealth v. Stokes,* 504 Pa. 455, 475 A.2d 714 (1984). Once it is determined that the course chosen by counsel had some reasonable basis designed to effectuate his client's interests, the inquiry into counsel's effectiveness ceases. Further, where it is apparent from the record that the actions claimed to constitute ineffectiveness were in fact within the realm of trial tactics, a finding of effectiveness may be made from the record. *Commonwealth v. Clemmons, supra.*

If the defendant is able to show that counsel's performance was deficient, the defendant then has the burden of showing that the deficient performance prejudiced the defense so as to deprive him of a fair trial. *Strickland v. Washington, supra.* The defendant must "clearly demonstrate not only possible prejudice, but prejudice such as would undermine the integrity of the verdict." *Commonwealth v. Brown,* 336 Pa. Super. 628, 486 A.2d 441 (1984). Before relief can be granted on this basis, defendant must prove that he suffered actual and significant prejudice as a result of the questioned representation.

Defendant contends that trial counsel was ineffective, inter alia,* because he failed, before trial, to

---

* The other grounds for ineffectiveness include: (a) he failed to object to the introduction of testimony about "harassing phone calls" before August 23 which had no demonstrable connection to defendant; (b) he failed to object to and have stricken the foundationless, subjective characterizations by Paula Krum that a caller's voice was seductive; (c) he failed to object to and have stricken the Paula Krum testimony that the caller insinuated an extramarital relationship, when Krum could supply no words used to support that interpretation; (d) he failed to object to and have stricken any and all testimony about C.F.A.S. as irrelevant to the charges and prejudicial to defendant; (e) he failed to object to the improper eliciting of irrelevant hearsay testimony from defendant by the prosecu-

move to suppress and, during trial, to object to inculpatory statements made by defendant to the police. The factual basis for this contention follows.

Prior to her arrest, defendant was asked to come to the police station and talk to Chief Edward Hutto, who was investigating the source of the telephone calls to Paula Krum. She voluntarily appeared. At trial, Chief Hutto testified without objection by defense counsel as follows:

*"Attorney McDonald:* In connection with your investigation in these matters, did you interview the defendant, Beth Yaroszeufski?

*"Chief Hutto:* Yes. I called her into the office.

*"Attorney McDonald:* Did you advise her of her *Miranda* rights?

*"Chief Hutto:* Yes. I gave her our normal rights form and she read it.

*"Attorney McDonald:* After that, did you have any conversation with Beth Yaroszeufski?

*"Chief Hutto:* No—not really. She refused to sign her waiver of rights so I could not question her any further. I did our normal general information form——which you don't have to advise rights of—of just getting her name, date of birth, Social Security number, and—

*"Attorney McDonald:* Well, at that time, did you have any further conversation with her?

*"Chief Hutto:* Yeah. During that time, she said a couple of times that she didn't know how this had happened and she couldn't believe this was happening—things like that. She also—so I asked her, at

---

tion concerning complaints of a Mr. Von York to a zoning officer; (f) he failed to advise defendant on the opportunity and importance of using reputation witnesses in a case of this type; (g) defense counsel may have been trying the case with a physical disability that affected his concentration to the extent that a continuance should have been sought. (Defendant's brief in support of post-verdict motions, at 4-5.)

that same point in time: *'Well, is there anybody else at your home, any adult female at your home that could have done this?'* And she answered, *'No.'* " (N.T. 1/11/89 at 111-2.)

At the ineffectiveness hearing, trial counsel explained why he made no objection:

*"Q:* Finally, for my purposes, sir—do you recall when Chief Hutto began his testimony and he was asked if he had any conversation with Beth Yaroszeufski?

*"Mr. McDougall:* At page 111, Counsel.

"By Mr. McDougall:

*"Q:* Do you recall that general area of the trial, sir?

By the witness:

*"A:* Yes, I do—and I reviewed that part of the testimony before I came here today.

*"Q:* Do you recall the chief responded, *'No—not really; she refused to sign her waiver of rights so I could not question her any further?'* Would you agree, sir, that was a reference to her post-arrest silence?

*"A:* That's a close one; and if I may explain. My impulse was—I'm not going to pretend that at the time I had all the cases in my head, but I knew enough to know that that is the law; that if the district attorney would attempt to capitalize on Beth's rights that I could object. I knew beforehand, though, in my conversations with both Beth Yaroszeufski as well as Chief Hutto, that Chief Hutto—because he had told me on the telephone—indicated that Beth had made some exculpatory statements at that time; and they appeared in his testimony. *'I don't know how this happened; I don't know what this is about.'* And, quite frankly, looking back, I don't know if I would have done the same thing. Maybe I would have done what you're

encouraging me to do. But at that time I thought this is a close call. I would rather have these exculpatory statements come out; and I wasn't quite sure whether the chief was talking about Beth's silence; because the first question was—I think a proper question—*'Did you read the Miranda rights?' That has nothing to do with it. We haven't reached the point yet. The second question was, I think—that Chief Hutto said she read it; and he still didn't say anything as to what her decision was with respect to the Miranda*—it was the third question, if my memory is correct; and you correct me if I'm wrong, because I don't have—

"*Q:* Do you want to see it, sir?

"*A:* Yes; that would help.

"*Mr. McDougall:* May I, Your Honor?

"By the witness:

"*A:* As a matter of fact, it's in your brief.

"By Mr. McDougall:

"*Q:* Okay."

(Whereupon a document was shown to the witness for his reference.)

"*A:* As I see it, the first question—I couldn't have objected. He had a right to ask him whether he made an investigation. The second question—I didn't feel at that time—and I still don't feel that that was—that I would have been a little premature at that point in time to pose any type of an objection based upon the theory that you're coming forward with. The fourth question—we're getting close; but I think that we have to realize that I had had conversations with both Beth and Chief Hutto and I knew—or at least I felt certain for sure that Hutto would say what he said—that he would come out and indicate that Beth made some exculpatory statements. I got a little nervous. I'm looking at it now. I think that, as soon as Chief Hutto said, *'No'*—and if he would have

stopped there, I should have been on my feet. But he said, *'No; not really';* and, to me, that was the introduction of something that I thought was worthwhile; so I let it all come in. And it came in pretty much as I thought. The one little problem that I have now—and I had then—is that Chief Hutto also said there was no other female at home. And I didn't think that was an issue; because Beth was going to admit that she made the telephone call; and that was a fact. I didn't see how that really could have prejudiced the jury in any way. Now in hindsight——and I'm not admitting that I was ineffectual by handling it this way. I made a judgment call. On hindsight—look, I lost the case. On hindsight, I'd do the whole thing over or differently; and I hope you get a chance to do that. But not on this argument. You have other good strong arguments that I think may work."

In our view, trial counsel was twice ineffective in dealing with the testimony of Chief Hutto.

First, the district attorney asked the chief if defendant had been advised of her *Miranda* rights. After the chief responded affirmatively, he was then asked if he had any further conversation with her. The chief then stated that she had refused to sign the waiver of rights form. (N.T. 111.) There was no objection or motion for mistrial to this line of inquiry and answers.

It is a clear violation of the accused's constitutional right against self-incrimination to make a reference at trial to his silence while in police custody. *Commonwealth v. Mays,* 361 Pa. Super. 554, 523 A.2d 357 (1987); *Commonwealth v. Gbur,* 327 Pa. Super. 18, 474 A.2d 1151 (1984); *Commonwealth v. Singletary,* 478 Pa. 610, 387 A.2d 656 (1978).

The jury certainly knew what the "rights" form was. The print and electronic media have made the *Miranda* right to remain silent and the right to counsel matters of common knowledge. Here, the jury was told that defendant invoked her Fifth Amendment right to remain silent by refusing to sign a waiver of rights form.

The Pennsylvania Supreme Court, in *Common-wealth v. Haideman,* 449 Pa. 367, 371, 296 A.2d 765, 767 (1972), pointed out the danger of post-arrest silence testimony:

"We would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt. *Walker v. United States,* 404 F.2d 900 (5th Cir. 1968) . . . It is clear that the privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury."

The reference to post-arrest silence, when objected to, is usually handled by the trial court with a cautionary instruction. Here, there was no objection. The jury could clearly infer that the accused had something to hide when she refused to waive her right to remain silent. We find that trial counsel was ineffective in not challenging this testimony and the testimony was substantially prejudicial to defendant.

Second, the chief was asked about any further conversation with the accused after she had refused to waive her rights. The chief, volunteering that he should not have done so, admitted to questioning the accused further. He asked her if there were any other adult females at her home that could have placed the phone calls. She said "No."

The accused, having invoked her rights, should not have been subjected to further interrogation.

40

*Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Zook,* 520 Pa. 210, 553 A.2d 920 (1989).

The fact that there was no other female but defendant in the defendant's home at the time the phone calls were made to Paula Krum was a crucial piece of evidence in this case. In order to prove its case the Commonwealth had the burden of proving that defendant was the actual caller and not someone else using her phone. The Commonwealth's case was woven entirely from circumstantial evidence. Its evidence showed that four calls were made to the Krum residence between 9:30 p.m. and 9:50 p.m.; that the voice was a female voice and the calls emanated from the phone in defendant's residence. Paula Krum testified that it was her opinion that the voice on the phone was that of defendant. Without defendant's admission to Chief Hutto, the jury had only Paula Krum's opinion as to who made two of the calls. With the inculpatory statement, the Commonwealth's case was substantially strengthened.

Moreover, defendant's defense was that she did not make the first three telephone calls to the Krum residence. Defendant's inculpatory statement that there was no other adult female but her in the house at the time the calls were made weakened that defense.

The Commonwealth does not dispute that defendant's admission was made during a custodial interrogation. When she refused to sign the waiver of rights form, she had an absolute right to remain silent and the chief had a solemn duty to stop questioning her.

In the landmark *Miranda* case, the Supreme Court of the United States set the parameters for the police questioning of suspects:

"[W]e hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent . . . After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.* " *Miranda v. Arizona,* 384 U.S. 436, 478-79 (1966). (emphasis supplied)

In *Commonwealth of Pennsylvania v. Bussey,* 486 Pa. 221, 404 A.2d 1309 (1979), the Supreme Court of Pennsylvania held that when the police failed to obtain an explicit waiver from the defendant, any statements gathered from the defendant were not admissible. *Id.*

Here, defendant did not make such an explicit waiver. Her inculpatory statement to Chief Hutto when he continued to question her was clearly suppressible and objectionable.

We find therefore that trial counsel was deficient in failing to object or to suppress defendant's admis-

sion to Chief Hutto. More importantly, defendant was significantly prejudiced by counsel's performance.

Because our disposition of this issue warrants the grant of a new trial, we shall not address the other claims of ineffectiveness or grounds for new trial.

For the foregoing reasons, we enter the following

### ORDER OF COURT

And now, March 18, 1991, it is hereby ordered and decreed that defendant's motion for a new trial be and is hereby granted and is awarded a new trial. This case shall be placed on the next available trial list.

