404 A.2d 1309

COMMONWEALTH of Pennsylvania, Appellee,

v.

Bruce B. BUSSEY, Appellant.

Supreme Court of Pennsylvania.

Argued April 27, 1979.

Decided Aug. 27, 1979.

Manderino, J., concurred in the result.

Nix, J., filed a dissenting opinion.

Larsen, J., filed a dissenting opinion.

Arthur R. Sagoskin, Gary B. Gilman, Doylestown, for appellant.

Peter F. Schenck, Asst. Dist. Atty., Stephen B. Harris, Doylestown, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

OPINION

EAGEN, Chief Justice.

Bruce B. Bussey, appellant, was convicted of murder of the first degree following a nonjury trial in the Court of Common Pleas of Bucks County. Post-verdict motions were denied, and judgment of sentence of life imprisonment was imposed. This appeal followed.

Bussey raises two issues seeking discharge or the grant of a new trial.

In support of his request for discharge, Bussey maintains the trial court erred in denying his application for an order dismissing the charges pursuant to Pa.R.Crim.P. 1100(f).

While trial did not commence within two hundred seventy (270) days from the date the complaint was filed, Pa.R. Crim.P. 1100(a)(1), and while no petition to extend the mandatory period in which to commence trial was filed, Pa.R.Crim.P. 1100(c), the Commonwealth argues trial commenced within the mandatory period of Pa.R.Crim.P. 1100(a)(1) because computation of the mandatory period requires exclusion of a period of time sufficient to bring the commencement of trial within the two-hundred-seventy-(270)-day mandate. Specifically, the Commonwealth urges

the period between December 21, 1973 and January 18, 1974 should be excluded.[1] The Commonwealth is correct.

The record shows that, on December 21, 1973, Bussey appeared before a district justice for a preliminary hearing.[2] The district justice asked Bussey if he wished to obtain private counsel and received an affirmative reply. The Commonwealth indicated it would not oppose continuing the hearing, but asked that the date be set after "the first of the year." Subsequently, the hearing was set for January 18, 1974 at which time Bussey appeared with counsel. Counsel then requested a continuance which was granted.

*Commonwealth v. Millhouse,* 470 Pa. 512, 368 A.2d 1273 (1977), is controlling as to this period. In *Commonwealth v. Millhouse,* supra, the accused who was not indigent presented himself for a preliminary proceeding without counsel and did not waive his right to counsel. For this reason, the proceeding was delayed. We concluded that, under such circumstances the accused was unavailable within the meaning of Pa.R.Crim.P. 1100(d)(1) and that the period of delay resulting from the unavailability, i. e. until counsel entered an appearance, was to be automatically excluded.

Instantly, Bussey appeared at a preliminary proceeding without counsel, did not waive his right to counsel, and was financially capable of retaining private counsel.[3] The delay in the proceeding was the result[4] of these circum-

1. This period is sufficient to bring the commencement of trial within the mandatory period.

    The Commonwealth also argues that a period or part of a period of one hundred and five (105) days should be excluded and that Bussey waived the protections of Pa.R.Crim.P. 1100. In light of our disposition, we need not consider these arguments.

2. A public defender was present, but indicated that he did not represent Bussey and that Bussey was attempting to retain private counsel.

3. Bussey maintains the record does not show this capability; yet, when asked if he wished to obtain private counsel, Bussey responded affirmatively and, in fact, obtained private counsel.

4. Here, as in *Commonwealth v. Millhouse,* supra, 470 Pa. at 518, 368 A.2d at 1276, the "sole reason for the delay was the absence of

stances and counsel did not enter into the case until January 18, 1974.[5]   Hence, Bussey was unavailable for this period, and it must be excluded pursuant to Pa.R.Crim.P. 1100(d)(1).[6]

■  Since this period must be excluded in computing the mandatory period and since doing so brings the commencement of trial within the confines of Pa.R.Crim.P. 1100(a)(1), the trial court did not err in denying the application to dismiss.[7]

In support of his request for a new trial, Bussey argues the trial court erred in refusing to grant his motion to suppress certain incriminatory statements given by him to police and in permitting evidentiary use of these statements at trial.   Specifically, Bussey argues the statements were given in violation of his constitutional rights as interpreted in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) [hereinafter: *Miranda* ] in that he did not expressly waive or indicate an understanding of his rights.[8] We agree.

The relevant facts are:

Bussey was arrested on December 14, 1973, in Burlington, New Jersey, at approximately 1:30 a. m. by police of that city.   At the scene of the arrest, Bussey was advised of

defense counsel."   The Commonwealth's request that the proceeding, once delayed, be scheduled after "the first of the year" did not cause the delay.

5.   Counsel did not enter an appearance at this time, but did appear at the proceeding on January 18, 1974.

6.   *Commonwealth v. Wade,* 475 Pa. 399, 380 A.2d 782 (1977), is distinguishable.   *Id.,* 475 Pa. at 406 n. 7, 380 A.2d at 785 n. 7.

7.   This period of unavailability did not result in a delay in trial, but that fact is irrelevant.   *Commonwealth v. Millhouse,* supra 470 Pa. at 518 n. 5, 368 A.2d at 1276 n. 5; *Commonwealth v. Cohen,* 481 Pa. 349, 392 A.2d 1327 (1978) (unavailability for arraignment excluded in determining if petition for extension of time is timely, i. e. filed prior to expiration of the mandatory period.)

8.   Bussey advances other reasons why evidence of the challenged statements should have been suppressed, but, in view of our disposition, we need not reach these additional arguments.

certain rights pursuant to *Miranda,* but "did not specifically acknowledge that he understood the rights as given" and did not expressly waive his rights.

Bussey was then transported to Burlington City Police Station. Arriving there at approximately 1:45 a. m., he was confronted by a detective from the Office of the District Attorney of Bucks County. The detective asked Bussey if he was "all right, and whether he was under the influence [of] drugs or alcohol." Bussey responded that he was alright and that he was not under any such influence.

Bussey was then asked if "he knew why he had been picked up," and he responded "it must be because [I] killed that dude back in Pennsylvania." The detective then left to make certain phone calls.

Shortly after 2:00 a. m., a Bensalem Township police detective and a Pennsylvania state trooper, who had been present during the 1:45 a. m. conversation, began talking to Bussey "about different things to get him talking." A conversation occurred concerning Bussey's girl friend. Then the two gave Bussey warnings pursuant to *Miranda* which he acknowledged and indicated he understood. Bussey indicated he was "willing to answer questions without the presence of an attorney." Bussey then told the two that the victim had been killed by "three men who broke into [Bussey's] house and that [he, Bussey,] was not responsible for the death of the victim."

The state trooper then told Bussey he did not believe him because it was contrary to what Bussey had said to the detective from the district attorney's office. Indeed, the trooper told Bussey he was "lying." Bussey began to talk about his girl friend, but the conversation soon returned to the subject of the crime. Bussey then stated: "I just can't tell you." [9] Bussey then began to "fill up a bit," i. e. got "ready to cry." The police detective then told Bussey he

9. The suppression court characterized this statement as an expression of emotion and not an exercise of the right to remain silent. We need not decide whether the court's characterization can be accepted or not in order to dispose of this appeal, and, accordingly, we do not.

might "feel better if he did talk about it." Bussey then gave an incriminatory statement which included a reference to throwing "guns off the Burlington Bristol Bridge." The questioning stopped at 2:30 a. m. when instructions were received from the district attorney's office that a formal statement would be taken when a court stenographer arrived and that interrogation was not to be conducted until then.

Subsequent to the above conversation, Bussey, in conversation with the detective from the district attorney's office about extradition, indicated "things looked pretty bad for him and . . . he might have to spend either a long time or the rest of his life in jail." He also stated he would ". . . plead guilty right now."

The court stenographer arrived at 4:05 a. m. and a formal statement was taken beginning at 4:28 a. m. Prior to taking the formal statement, a lieutenant of the Bensalem Township Police Department, who was the chief questioner, warned Bussey of his rights. At the conclusion of the recitation of the warnings when asked if he understood "all of the things that have just been explained," Bussey asked the lieutenant to "[b]ack up to the last part." The lieutenant repeated the warning which advises of the right to a "lawyer . . . free of charge" if Bussey could not "afford to hire" one. Bussey then responded, "[o]kay," and was then asked if he understood his rights as explained. He indicated he did and was asked if he wanted "to answer our questions without a lawyer being present . . .? Yes or no." Bussey asked: "Can I say something besides yes or no?" When told he could, he asked, "What do you recommend?" The assistant district attorney who was present replied:

"That's up to you to decide since we are representing the District Attorney's Office. It's up to you to decide whether you want to answer our questions without a lawyer being present."

Bussey then stated: "Okay, I will, I'll answer your questions."

Questioning began but shortly thereafter when asked what happened when the victim came to Bussey's house, he asked: "I ain't allowed to ask no questions?" The lieutenant responded: "Ask whatever you want." Bussey responded:

"Well, I explained everything to him [the detective from the office of the district attorney, see p. 5 supra] before. I don't know why I have to say this now."

The lieutenant responded: "Well, we would like to hear this again ourselves." Bussey replied: "[o]kay," and the formal statement continued until completed at 5:04 a. m.

Bussey waived extradition before a judge in Mt. Holly, New Jersey and was transported to Bensalem Township Police Headquarters where he arrived at 11:00 a. m. on December 14, 1973.[10] At 1:30 p. m., while being processed, Bussey saw the detective from the district attorney's office, see 1312, supra, and indicated that he wished to speak to him in private. The detective indicated such a conversation would have to await completion of processing.

At 2:00 p. m., Bussey spoke to the detective who told Bussey in response to inquiries that, "if one of two people do a job, and both get arrested," it would be up to the court whether "they have to serve time in the same prison" and that the detective was aware of a gang-related crime where persons served in separate prisons. The detective then asked "why . . . was someone else involved with you in this killing." Bussey replied: "Yes, but I don't know if I would testify against him, I would fear for my life." Bussey then incriminated one Dwight Tools and advised the detective that he had not thrown the guns involved over a bridge, and that Tools had one gun and the other was in New Jersey. Bussey was then taken to a lieutenant's office where he repeated the above information, was advised he

10. While in route, Bussey engaged in conversation with two detectives in which he asked various questions including what would happen if he could prove he did not kill the victim. He was told, if that were so, he would be let go, but that was not what Bussey had said the previous night. There is no indication in the record that Bussey was warned of his rights at this time.

could not be taken across the state line to locate one of the guns, and indicated the location of the gun. The gun was found where Bussey indicated it was left. Warnings were not given to Bussey during or immediately prior to this conversation. Bussey was arraigned at 3:45 p. m.

The suppression court, in effect, found an implicit understanding and waiver of constitutional rights by Bussey before Bussey first incriminated himself in response to the inquiry if he knew why he had been picked up. As noted before, Bussey was not warned of his constitutional rights at this exact time. While it is true that such warnings were given about fifteen minutes earlier at the scene of the arrest, the record demonstrates that, at that particular time, Bussey did not acknowledge he understood or waived his rights.

In *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the United States Supreme Court held an implicit waiver of rights could be found where an accused expresses understanding of his rights and gives a statement without expressly waiving his rights. We could distinguish the instant case on the basis that Bussey never expressed an understanding of his rights prior to incriminating himself at 1:45 a. m., but we decline to do so and we decline to follow *North Carolina v. Butler,* supra.

■ *Miranda* surely requires warnings be given, and the Supreme Court of the United States has not departed from this per se requirement. Accordingly, that Court still recognizes a need for warnings as a matter of federal constitutional law, and we are bound to follow this mandate. Since that is so, we fail to understand why an explicit waiver [11] should not also be required, and, accordingly, pursuant to our supervisory powers and interpretation of the Pennsylvania Constitution, we hold an explicit waiver is a mandatory

11. By explicit waiver, we mean an outward manifestation of a waiver such as an oral, written or physical manifestation.

requirement.[12]  See *Commonwealth v. Goldsmith,* 438 Pa. 83, 263 A.2d 322 (1969).  Cf. *Commonwealth v. Walker,* 470 Pa. 534, 546, 368 A.2d 1284, 1290 (1977) (Eagen, J. concurring opinion joined by Jones, C. J., O'Brien and Pomeroy, JJ.) (standard warnings and explicit responses "most desirable").

Our ruling, unlike *North Carolina v. Butler,* supra, will promote certainty in knowing an accused has waived his rights and will avoid a mountain of litigation which might otherwise result from trying to determine what "implicitly" went on in an accused's mind.[13]  Cf. *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977).  Our ruling will also serve to impress on an accused the importance of his decision.[14]  Furthermore, assuming *North Carolina v. Butler,* supra, was concerned with additional burdens being placed on law enforcement officials, given *Miranda,* we cannot agree our ruling creates any such burden.  Surely if the rights must be explained, merely asking for an answer to a question is no great burden, and, even if it is a burden, it will promote certainty in the law and, thereby, eliminate a greater burden resulting from allowing implicit waivers.

Accordingly, since Bussey expressed no desire to waive his rights prior to giving the 1:45 a. m. incrimination, it was illegally obtained and having allowed evidentiary use thereof requires the grant of a new trial.[15]

**12.**  We do not mean to imply an express waiver for each and every right is necessary.

**13.**  In addition to warnings, an expression of understanding, and the giving of a statement, a multitude of manifestations by an accused can occur between an expression of understanding and a giving of a statement.  Our ruling will not eliminate consideration of such manifestations, but, by requiring an express waiver, we can limit the number of cases in which the multitude of manifestations may affect the ultimate finding of a waiver.

**14.**  The importance of waiving one's rights is obvious, and, by our ruling, we seek to promote a deliberate and conscious decision *before any statement is given.*  Common sense teaches persons often speak before they think.

**15.**  Certainly the question asked of Bussey was "likely to or expected to elicit a confession," *Commonwealth v. Simala,* 434 Pa. 219, 227, 252 A.2d 575, 579 (1969), and, hence, constituted interrogation.

■ The incriminatory statements obtained from Bussey during the 2:00 a. m. conversation were clearly the fruit of the prior illegally obtained statement since they were given only after Bussey was confronted with the 1:45 a. m. incrimination. Hence, it was obtained by exploitation of the primary illegality and was improperly admitted into evidence. *Commonwealth v. Frazier,* 443 Pa. 178, 279 A.2d 33 (1971); *Commonwealth v. Ware,* 438 Pa. 517, 265 A.2d 790 (1971). Also, the formal statement given at 4:28 a. m. was improperly allowed into evidence for the same reason as the 2:00 a. m. statement. While the "link" is not as strong in connection with the 4:28 a. m. statement as it is with the 2:00 a. m. statement, the request to hear the same thing again clearly precludes a ruling that the 4:28 a. m. statement was "purged of the primary taint." *Commonwealth v. Ware,* supra, 438 Pa. at 521, 265 A.2d at 792.

Judgment of sentence reversed and a new trial is granted.

MANDERINO, J., concurs in the result.

NIX, J., files a dissenting opinion.

LARSEN, J., files a dissenting opinion.

NIX, Justice, dissenting.

Today's majority opinion calls to mind the witicism of Abraham Lincoln that "calling it a leg doesn't make it so." Such is the case with today's decision labeling the delay from appellant's first aborted preliminary hearing to the second as due to appellant's unavailability instead of properly identifying it as a continuance. This distinction is not a quibble, as the circumstances of this case point out.

Rule 1100(d) of our Rules of Criminal Procedure states: (d) In determining the period for commencement of trial, there shall be excluded therefrom such period of delay at any stage of the proceedings as results from: ·

*Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Commonwealth v. Mercier,* 451 Pa. 211, 302 A.2d 337 (1973).

(1) the unavailability of the defendant or his attorney; (2) any continuance in excess of thirty (30) days granted at the request of the defendant or his attorney, provided that only the period beyond the thirtieth (30th) day shall be so excluded.

In the instant case, appellant was arraigned on December 14, 1973, and a preliminary hearing was scheduled for December 21. At the preliminary hearing, appellant indicated to the court that he wished to retain private defense counsel. In response, the court stated:

I want the defendant to be entitled to all of his rights, one of which is to retain private counsel. I will grant this request and the hearing will be *continued* on that ground. (Emphasis added).

At the suggestion of the assistant district attorney, the preliminary hearing was continued to "after the first of the year"—specifically, to January 18, 1974. On January 18, appellant appeared with private counsel for the preliminary hearing. The majority of the Court today agrees with the trial court that this 28-day period of delay is chargeable to the appellant and should be excluded from the computations fixing the run-date of Rule 1100. It appears obvious to me that the delay was the product of a *continuance* granted for the benefit of appellant so as to allow him to retain counsel of his choice. Since the continuance was not in excess of thirty days, section (d)(2) mandates that the period of delay cannot be excluded from the computation of the Rule's run-date.

The majority contends that our opinion in *Commonwealth v. Millhouse*, 470 Pa. 512, 368 A.2d 1273 (1977) requires a contrary result. *Millhouse* and the instant case, however, are clearly distinguishable. In *Millhouse* the defendant purposefully abused the judicial system by causing a four-month delay through his dilatory efforts to retain private counsel. Millhouse was arraigned and apparently let out on bail on February 6, and appeared unrepresented by counsel at preliminary proceedings scheduled for March 12 and 20; April 15, 18, and 25; and May 1 and 3. It was not until May

28 that private counsel entered his appearance for Millhouse. The sole reason Millhouse gave for the delay was difficulty in agreeing on a fee with his counsel.

In the instant case, appellant Bussey was given only one week from the date of his arraignment to his preliminary hearing to locate and retain private counsel; Millhouse had over a month before the March 12 listing. In addition, Bussey was incarcerated during the week between arraignment and bail while Millhouse was free on bail. Appellant Bussey did successfully retain private counsel and was represented at the continued preliminary hearing while Millhouse failed to retain private counsel despite several admonitions by the court. Appellant Bussey's failure to be represented at the December 21 hearing caused only a 28-day delay, much of which must be charged against the prosecution and the court for suggesting and setting the second hearing as late as January 18; while Millhouse caused a delay of over three months. Additionally, except for the initial postponement of the preliminary hearing, there is no delay of judicial proceedings attributable to Bussey's lack of representation; Millhouse's disinclination to retain counsel caused the postponement or cancellation of judicial proceedings seven separate times. Because Millhouse purposefully stymied the orderly functioning of the judicial process, it was appropriate to charge the attendant delay against him for Rule 1100 purposes and find that the delay was caused by the unavailability of counsel. This same conclusion is not appropriate in the instant case because Bussey merely exercised his sixth amendment right to retain counsel in an expeditious fashion.

The effect of today's holding is to rewrite Section 1100(d)(2) to exclude continuances *where the reason for the continuance is to secure representation.* I can find no logical or legal basis for such an exclusion. To the contrary, I can think of no more legitimate basis for the postponement of a proceeding than to afford a party reasonable opportunity to secure representation of his or her choice. I would find

the period of delay complained of to be a continuance and includable in fixing the Rule 1100 run-date in this case. Accordingly, I would reverse the judgment of sentence and order the appellant discharged.[1]

LARSEN, Justice, dissenting.

I dissent. First, I cannot agree with the majority's conclusion that the detective's questions "constituted interrogation". Appellant was merely asked if he was "all right"; if "he was under the influence [of] drugs or alcohol"; and if "he knew why he had been picked up". Such questions do no more than inform the police of whether a defendant is suffering discomfort and in control of his faculties, and whether he has been advised of the charges against him. They are preliminary to determining whether a defendant is able to knowingly, intelligently, and voluntarily waive his rights and answer questions concerning the crime charged; they are not "likely to or expected to elicit a confession."[1] Accordingly, I would hold that appellant's statement was not the product of custodial "interrogation" and did not, therefore, require a waiver of constitutional rights.[2]

1. In view of the majority's reliance upon the period of delay between December 21 and January 18, I need not reach the question of whether some other period could be chargeable to appellant so as to bring his trial within the limits of Rule 1100. In addition, in view of my belief that appellant should be discharged, I need not reach the other issues considered by the majority.

1. The detective who asked these questions obviously felt that this was the case because, after appellant responded to the third question with his inculpatory statement, the detective did not pursue the matter further and left the room to perform other duties.

2. *See, Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966):

In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.* (emphasis supplied)

Moreover, even if these questions constitute interrogation, appellant had been advised of his constitutional rights shortly before answering them and, as the Supreme Court recently held in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), a defendant's responses to questioning can support a finding that he has waived his constitutional rights notwithstanding the absence of an express waiver. The majority, however, declines to follow this precedent and holds that an express waiver is required because it "will promote certainty in knowing an accused has waived his rights and will avoid a mountain of litigation which might otherwise result  .   .   .".

While an express waiver of constitutional rights is certainly more desirable than a waiver implied from conduct, I do not believe that the rule adopted by the majority is necessary to insure that an accused's rights have been protected. There are cases where "waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler, supra*, at 373, 99 S.Ct. at 1757. Further, I believe that society's interests in justice and effective law enforcement outweigh judicial convenience. The question of waiver should be addressed in terms of substance, and not in terms of "which of its forms are the most judicially manageable." And, finally, I note that every other court which has considered the inflexible *per se* rule adopted by the majority has rejected it.[3]

Accordingly, I dissent from the majority opinion and would, for the foregoing reasons, affirm the judgment of sentence.

**3.** The question has been addressed by ten of the eleven United States Courts of Appeals and the courts of at least seventeen states. See, *Id.* 441 U.S. at 375, n. 5, n. 6, 99 S.Ct. 1755.