639 A.2d 763

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert T. HUGHES, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 1991.

Decided March 25, 1994.

---

Jenny L. Steinen, West Chester, for appellant.

James P. MacElree, II, Dist. Atty., Nicholas J. Casenta, Jr., Asst. Dist. Atty., Robert A. Graci, Chief, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This is an automatic direct appeal[1] from two sentences of death imposed upon appellant by the Court of Common Pleas of Chester County following his conviction of two counts of first degree murder and one count each of robbery, possession of instruments of crime, and violation of the Uniform Firearms Act. The charges arose as a result of the shooting deaths of two employees of a McDonald's restaurant located in Chester County, Pennsylvania, on the morning of January 8, 1989. For the reasons that follow, we affirm the convictions and the judgment of sentence.

Shortly after the murders occurred, appellant was arrested in Delaware which is but a short distance from the scene of the murders. Following his arrest, appellant was extradited to Pennsylvania and incarcerated at Chester County Prison. On petition of defense counsel, a hearing was held on February 10, 1989, to determine appellant's competency to stand trial. Following the hearing, the court entered an order

1. See, 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. Rule 702(b).

committing appellant to Norristown State Hospital for evaluation and testing and staying the proceedings pending completion of said evaluation. Ultimately, appellant was found by the court to be competent to stand trial.

On September 28, 1989, a hearing was held on appellant's motion to suppress certain physical evidence and statements following which the court denied the motion in its entirety. After three days of jury selection, appellant elected to forego a jury trial and instead, entered a *nolo contendere* plea of "guilty but mentally ill." The court then gave a lengthy colloquy, informing appellant of all of those rights which he would be relinquishing as well as the elements of the offenses with which he was charged. The court then accepted the plea as tendered.

However, later that same day, both counsel and the court agreed that the proper procedural posture in which appellant could present a defense of "guilty but mentally ill" was a non-jury trial and not a *nolo contendere* plea. The court again informed appellant of his right to a jury trial whereupon appellant signed the waiver form. The case then proceeded as a bench trial with stipulated facts.

Following the bench trial, appellant was found guilty of the above listed crimes. A separate penalty hearing was held after which the court found, as to each murder, two aggravating circumstances which it determined outweighed the four mitigating circumstances.[2] Thereafter, the trial court heard and denied appellant's post-trial motions. On July 31, 1990, a formal sentencing hearing was held following which the court imposed two consecutive death sentences as well as a sentence

2. The two aggravating circumstances were (1) that appellant committed the killings while in the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)), and (2) that appellant has been convicted of another murder committed at the time of the offense at issue (42 Pa.C.S. § 9711(d)(11)). The mitigating factors included, first, that appellant had no significant history of prior criminal convictions (42 Pa.C.S. § 9711(e)(1)); second, that the defendant was under the influence of extreme mental or emotional disturbance (42 Pa.C.S. § 9711(e)(2)); third, the age of appellant (42 Pa.C.S. § 9711(e)(4)); and fourth, any other mitigation concerning the character and record of appellant and the circumstances of his offense (42 Pa.C.S. § 9711(e)(8)).

of ten (10) to twenty (20) years on the robbery conviction. This automatic direct appeal followed.

As in all cases in which the death penalty has been imposed, this Court is required to conduct an independent review of the sufficiency of the evidence even where, as here, the defendant has not specifically challenged the conviction on that ground. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt. *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986). As stipulated, the evidence establishes the following:

On January 8, 1989, two employees of the McDonald's restaurant located in the Parkway Shopping Center in West Goshen Township, Chester County, Pennsylvania, were found murdered, each by a single gunshot wound to the head. On that date, at approximately 5:15 a.m., James Jenkins was delivering newspapers at the shopping center when he noticed a blue and white automobile in the parking lot of the McDonald's restaurant. Upon being shown a photograph of appellant's car, Mr. Jenkins was of the opinion that the car depicted in the photograph was identical to the one he saw in the parking lot on the day of the murders.

At approximately 5:30 a.m. that same morning, an employee of the McDonald's, Brian Burnette, arrived for work. As he was about to enter the building, he noticed a man standing inside the restaurant waving a gun in the direction of the manager, Jean Reider, who was carrying cash drawers from the safe and placing them on the counter.

Another employee, Brian Titus, also arrived at approximately 5:30 a.m. As he entered a door to the restaurant, he noticed a person lying on the floor in front of a desk that was

located next to the safe who was signaling for Titus to leave the restaurant. Titus also observed a person, approximately six feet tall, standing inside the restaurant with arms extended as though holding something in his hand. Both Titus and Burnette then went to a nearby store to call the police.

When the police arrived at the scene, they discovered the bodies of Charles Hegarty and Jean Reider. The body of Charles Hegarty was found in the exact location where Brian Titus had seen someone lying earlier. Jean Reider's body was found in the corner of a room. The blood stains on the wall indicated that she had been shot while sitting with her legs crossed and curled up. The safe was open and the cash drawers had been taken out and left on the floor. No money was left in the cash drawers except for some rolls of coins. Six crumpled one dollar bills were found next to a dumpster outside the McDonald's.

At approximately 6:30 a.m. that same morning, Steven Quigley, proprietor of a local towing business, received a telephone call from a man who asked to be picked up at the Abbey Green Motel which is located approximately six tenths of a mile south of the McDonald's restaurant. The man requested that Quigley tow the man's blue Plymouth to Jack Wolf's Sunoco so that it could be repaired. When Quigley asked the man why he did not use Wolf's tow trucks, the man responded that all of Jack Wolf's tow trucks were out and unavailable. However, when Quigley drove past Wolf's Sunoco he observed that all of Wolf's tow trucks were in, not out as the caller had indicated.

When Quigley arrived at the Abbey Green Motel at approximately 6:50 a.m., appellant appeared from between the buildings. As he walked to Quigley's truck, appellant was holding his side with his arm as though he was either hiding something or hurt. When Quigley asked appellant where his car was parked, appellant responded that the Birmingham Township police had towed it. Quigley suspected that was not true as he, himself, performed all towing work for the Birmingham Township police. Moreover, Quigley knew that the Abbey Green Motel was not located in Birmingham Township. Nev-

ertheless, Quigley agreed to drive appellant to the Tally Ho Motel in New Castle County, Delaware. Upon their arrival there, appellant paid Quigley the sum of $25.00 in crumpled five dollar bills. Quigley last saw appellant speaking with the desk clerk at the Tally Ho.

After requesting the desk clerk to call a cab for him, appellant then went to an adjacent Wawa Market to purchase a soda. Appellant left the Wawa Market after purchasing the soda, but returned shortly thereafter requesting a paper bag. Appellant then took a cab to the Clemente bus station located in Wilmington, Delaware.

At approximately 8:30 a.m. that same morning, Officers Cottingham and Boyd of the Wilmington Police Department, while on routine patrol, received a radio broadcast dispatching them to the area of the Clemente Bus station to look for a possible fugitive from Pennsylvania who was wanted for an outstanding warrant. The officers arrived at the bus station and after noticing no one in the waiting room area of the station matching the description broadcast over the radio, one of the officers entered the men's restroom. Once in the restroom, the officer noticed someone matching the description. The officer then exited the restroom and informed his partner that he believed the suspect was in the restroom. They then radioed for backup assistance. As appellant exited the restroom, Officer Boyd asked him his name and after appellant responded in a hostile manner, Officer Boyd explained to appellant that they were looking for a fugitive from Pennsylvania. Appellant remained hostile, refusing to comply with any of the officers' requests. A struggle ensued during which a .38 revolver fell from appellant's pocket. As all three struggled to retrieve the gun, Officer Boyd struck appellant with his blackjack. Appellant was eventually transported to a hospital as a result of injuries he incurred during the struggle. Upon his arrest, appellant had in his possession a Wawa bag and a Colt 6 shot revolver.

Upon examination of the Colt revolver, Officer Cannon of the Wilmington Police Department observed two spent cartridges as well as four live rounds of .38 caliber ammunition.

The Wawa bag seized from appellant contained a blue American Bank bag in which was found various papers subsequently determined to have been taken from the McDonald's restaurant, as well as a sum of money. The Wawa bag contained a second bank bag inside of which was found another sum of money. Six live .38 caliber special ammunition were seized from the right pocket of the jacket appellant was wearing.

While at the hospital, appellant, after having been read his *Miranda* rights, was advised that he was a suspect in a double homicide and robbery which had occurred at the McDonald's restaurant to which he responded, "If I knew I was being arrested, it would have been your life." Appellant also stated that the revolver had been purchased by him at a gun shop in Malvern, Pennsylvania. He claimed, however, that the bullets had been spent at a park. He then told the police that his name was "Tony" and that the money in his possession belonged to him, part of which he claimed to have received from a man by the name of John Rodriguez. Appellant described John Rodriguez as a twenty-five year old Puerto Rican male and claimed that he had previously telephoned Rodriguez to arrange a meeting that morning at the Wawa near the Tally Ho Motel so that Rodriguez could pay appellant the money, in partial satisfaction of a debt. Contrary to appellant's assertions, however, the records obtained for appellant's home telephone did not reflect any calls to Rodriguez. Moreover, the clerk who attended to appellant that morning at the Wawa Market did not see any Puerto Rican male in the presence of appellant.

A blue and white Plymouth Volare was found parked on Cheyney Drive which is located directly south of the Abbey Green Motel. A search warrant was issued for the car and a box of .38 caliber ammunition was recovered from the car. Also found within the car was a sales receipt for the vehicle in the name of Terrence Russo of 99 Concord Meeting Road, Glen Mills, Pennsylvania, that being the same address that appeared when the police ran a driver's license check under the name of Robert T. Hughes.

It was also determined that the gun which was seized upon appellant's arrest had been purchased by him just two days prior to the double murder. The record reveals that appellant had originally ordered a Charter Arms .38 caliber short barrel gun from the Malvern Gun Shop, but after having phoned the store several times inquiring about why it was taking so long for his order, appellant appeared at the gun shop on January 3, 1989, decided that he wanted a Colt gun instead and ordered the same. He took delivery of the Colt gun on January 6, 1989 and was, at that time, also supplied with human silhouette targets. He did not have a license to carry a gun.

On January 5, 1989, just three days before the murders, appellant was observed at approximately 4:00 a.m. in a parked car outside a McDonald's restaurant in Delaware County. When appellant was approached by an off duty police officer, he claimed to be having battery problems. On the evening of January 6, 1989, the manager of a McDonald's restaurant in Exton, Pennsylvania, received a telephone call from a man who identified himself as an employee of a McDonald's located in California. The caller then "asked about the opening procedures for McDonald's in Exton." N.T. 11/3/89, 140–41. That same evening, an identical call and inquiry was made to a McDonald's in Downingtown, Pennsylvania. Appellant's telephone records were obtained pursuant to a search warrant which records revealed that both calls were made from appellant's home.

As noted previously, it was determined that Charles Hegarty died from a contact gun shot wound to the head. The nature of the wound was consistent with the victim's head having been on a hard floor at the time he was shot. The other employee, Jean Reider, also died of a gun shot wound to the head. The pathologist opined that Reider had been shot from approximately a foot and one-half to two feet away and that she was shot while sitting in a corner with her head turned to the right.

While Federal Bureau of Investigation ballistics experts could not state with certainty that the slugs taken from the

victims definitely came from the gun that was seized from appellant, they were able to conclude that the slugs were fired from the same type of gun; same make and model, the number, width, and twists of lands and grooves were the same. Ballistics experts also stated with certainty, that the bullets that were removed from the victims' heads, the live rounds seized from appellant's gun, the bullets found in appellant's jacket pocket and the bullets found in appellant's car all contained lead from the same homogenous pot.

A former high school classmate of appellant, Darlene Devakow, received a letter from appellant postmarked March 17, 1989, in which appellant confessed to the murders. He claimed that he shot one of the employees because that employee had reached for a gun. He also told her that he could lie to others, but not to her and that he had fabricated much of what he told to the psychiatrists and physicians in order to fake insanity. In that letter, appellant told Ms. Devakow that he would call her on March 23, 1989, at 7:05 p.m. Appellant did, indeed, telephone Ms. Devakow on that date and repeated much of what he had written in the letter. He admitted that his motive was robbery and that he knew that he had fooled the psychiatrists and doctors. Because Ms. Devakow would not consent to a recording of the conversation, the Commonwealth obtained prior court approval to intercept that conversation. At trial, the Commonwealth introduced into evidence the transcript prepared from that tape as well as the actual tape.

Clearly, the above facts were sufficient to support appellant's convictions for two counts of first degree murder and one count each of robbery, possession of instruments of crime and violation of the Uniform Firearms Act. In fact, appellant does not challenge the sufficiency of the evidence of his convictions. Having concluded that the evidence was sufficient to support the convictions, we shall now address appellant's particular claims of error.

### SUPPRESSION ISSUES

Appellant raises several issues of alleged trial court error regarding suppression. When reviewing rulings of a

suppression court, we must determine whether the record supports that court's factual findings. In so doing, we consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Cortez,* 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985).

Initially, appellant contends that the trial court erred in denying his motion to suppress two particular statements he made after he was arrested.

Following his arrest, appellant was transported to Wilmington Hospital. Officer Lacko and Detective Smith of the West Goshen Township police department arrived at the hospital and were directed to the emergency room where they encountered appellant. Detective Lacko informed appellant that he and Detective Smith were investigating a double murder and robbery. Officer Lacko then read appellant his *Miranda* rights from the Standard Police Interrogation Card. Appellant orally indicated that he understood each right. The officer then asked appellant whether he wished to give up these rights and talk with the officers. Appellant responded that he did not understand what this was all about. Detective Smith then stated that they were investigating a double murder and robbery that occurred at a McDonald's in Pennsylvania. Appellant then responded: "If I knew I was being arrested, it would have been your life." The police then questioned appellant about the gun. Appellant stated that the gun was his and that he had bought it on November fourth at the Magnum Gun Shop in Malvern. Upon further questioning by the police, appellant told them that the money found in his possession belonged to him and that part of it was money given him by one John Rodriguez in satisfaction of a debt. He claimed that he had arranged to meet Rodriguez at the Wawa store located near the Tally Ho. When the officers asked him what he had done prior to going to the Tally Ho, appellant

responded that he wished to speak with a lawyer. At that point the officers ceased all interrogation.

Appellant first claims that his statement should have been suppressed because he had not knowingly waived his *Miranda* rights. It is unclear from appellant's argument whether he is referring to the statement he made to the effect that had he known that they were going to arrest him, it would have been their lives or whether he is referring to the statements he made regarding the gun and the money. In either case, appellant's argument is without merit.

Appellant contends that because he did not *expressly* waive his *Miranda* rights prior to the officers interrogation, the officers violated the mandates of this Court's holding in *Commonwealth v. Bussey*, 486 Pa. 221, 404 A.2d 1309 (1979). In *Bussey*, this Court rejected the "implicit waiver" rule of *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), holding instead that, as a matter of state constitutional law, an *explicit* waiver would be required.

Appellant's initial statement that it would have been their lives, was not the product of police interrogation but, rather, was a voluntary utterance made while the police were attempting to ascertain whether he understood his rights. It is well settled that a spontaneous utterance, unsolicited by the police, is admissible. *See, Commonwealth v. Clark*, 454 Pa. 329, 311 A.2d 910 (1973); *Commonwealth v. Whitley*, 500 Pa. 442, 457 A.2d 507 (1983). Accordingly, we need not even apply the holding in *Bussey* to this particular statement.

On the other hand, the statements made by appellant regarding the gun and the money were, indeed, made in response to police interrogation and hence require that we examine our decision in *Bussey*.

Appellant would have us find that in order for a waiver to be "explicit" under the holding of *Bussey*, there must be an affirmative statement to that effect made by the defendant. *Bussey*, however, does not require such. Indeed, in an effort to clarify its holding, the *Bussey* Court stated the following:

In addition to warnings, an expression of understanding, and the giving of a statement, a multitude of manifestations by an accused can occur between an expression of understanding and a giving of a statement. Our ruling will not eliminate consideration of such manifestations, but, by requiring an express waiver, we can limit the number of cases in which the multitude of manifestations may affect the ultimate finding of waiver.

*Commonwealth v. Bussey,* 486 Pa. at 231 n. 13, 404 A.2d at 1314 n. 13. Appellant by his actions, clearly manifested an intent to waive his rights at the time that these allegedly incriminating statements were made. As noted above, he clearly and unequivocally indicated after each right was read to him that he understood. And, while he did not directly answer the question as to whether he wished to waive those rights and speak with the officers, he did continue to manifest his understanding of those rights. Moreover, the statements made by him in response to the officers' questions were not even incriminating. For instance, while he did admit that he recently bought the gun, there was *nothing particularly* incriminating in that response as the gun was found on his person at the time the officers apprehended him in the bus station. He added that he had been at a range in a park, practicing his shooting. Then, in an attempt to explain the money found in his possession, appellant stated only that a portion of the money was his and the remaining amount had been given to him by Rodriquez in satisfaction of a debt. Certainly there was nothing incriminating about these statements and, therefore, even assuming *arguendo* that he had not "explicitly" waived his rights, the error was harmless.

Immediately following these two statements, appellant did, however, invoke his *Miranda* rights whereupon the interrogation ceased. Indeed, appellant asked for counsel without any additional instructions from the officers, which further evinces that appellant understood his rights when he responded to the officers' questions. Accordingly, the trial court properly denied suppression of these statements.

■ Appellant next contends that a statement he made to one of the officers following his invocation of his right to counsel should have been suppressed. For the following reasons, appellant's argument is also without merit.

As noted above, Officers Lacko and Smith ceased questioning appellant immediately upon his request for counsel. Officer Lacko remained in the room with appellant for a short time, but then left and was replaced by Officer Boyd. Officer Boyd testified that the following then occurred:

"I sat down, okay, and I looked the defendant right in his eyes. And I stated to him you know, after being informed of the events which took place, I got to thinking to myself and I state to him, I said: You're a mean man. You're a very mean man. I said: I can't—I just can't understand what would make a person do, you know, such a thing, what you've done.

And the subject looked down. Then he looked back up and stared at me, stared at me, very mean eyes, and banged one fist on the table and he said: Damn.

Then he looked at me again. He said: Only if I had knew that you had come to the police station—excuse me. Only if I had known that you had come to that bus station to arrest me, then he smiled, he said: I would have killed you, too."

(N.T. 9/28/89 pp. 17–18). Contrary to appellant's position, the Commonwealth submits that the above conversation took place prior to appellant having received his *Miranda*. Indeed, it is unclear from the record whether this statement was made during the course of the interrogation, prior to appellant's assertion of his right to counsel, or after the interrogation ceased and hence, after appellant invoked his right to counsel. If given prior to appellant's assertion of his right to counsel, the statement is admissible for the same reasons the statements discussed previously were admissible. If, on the other hand, the statement was given after appellant had invoked his right to counsel, we would still conclude that it was properly admitted.

Appellant contends that the use of this statement at trial violates the holding of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'g denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). In *Edwards,* the United States Supreme Court held that once a suspect asserts his or her right to counsel, all interrogation must cease until counsel has been afforded. 451 U.S. at 484, 101 S.Ct. at 1884. The holding in *Edwards,* however, is not dispositive of the issue presented here because the conversation between Officer Boyd and appellant did not constitute interrogation.

Interrogation has been held to encompass not only express questioning, but also any words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating statement. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Commonwealth v. Whitley,* 500 Pa. 442, 457 A.2d 507 (1983). The statements made by Officer Boyd do not reach this threshold. As noted previously, Officer Boyd, only one and one-half hours prior to the time the above conversation took place, had been dispatched to the Clemente bus station to investigate a relatively routine matter and ended up scuffling with the suspect who was armed with a revolver. It was not until later that Officer Boyd learned that the suspect was wanted in connection with a double execution-style murder of two McDonald's employees. Accordingly, we would agree with the finding of the trial court that these statements were simply a "spoken reflection of the officer's newly acquired information" regarding the events which led to the arrest of appellant and in no way constituted interrogation so as to warrant suppression of appellant's statement. Appellant's statement made in response to Officer Boyd's statements was an unsolicited, gratuitous statement and as such, was not subject to suppression. *See, Commonwealth v. Whitley,* 500 Pa. 442, 457 A.2d 507 (1983).

Moreover, even assuming that the statement was improperly admitted, we would deem the admission of such statement to be harmless error given the fact that the objectionable statement was merely cumulative of other evidence already

admitted. Because the statement of which appellant now complains is so similar to the statement "if I knew I was being arrested, it would have been your life" which we have already concluded was properly admitted, one is hard pressed to find how appellant was prejudiced by the admission of this second statement. *See, Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978).

Accordingly, for all the foregoing reasons suppression of these statements was properly denied.

■ Appellant next contends that the trial court erred in failing to suppress evidence of appellant's school records and Haverford State Hospital commitment records on the basis that the Commonwealth had obtained same in violation of the Fourth and Fourteenth Amendments to the United States Constitution and appellant's right to privacy.

On February 10, 1989, the court held a competency hearing in order to ascertain whether appellant was mentally fit to stand trial. During the hearing, two of the defense's expert witnesses testified that they based their opinion as to appellant's competency, in part, on his high school psychological testing and upon records procured from Haverford State Hospital. On February 17, 1989, the trial court entered an Order admitting appellant to Norristown State Hospital for evaluation regarding his ability to assist in his defense. Sometime thereafter, and in preparation for trial, the Commonwealth obtained these records pursuant to search warrants. Then, on July 6, 1989, the trial court ruled that appellant was, at that time, competent and able to proceed and thus, lifted the stay of proceedings previously entered on February 17, 1989. The trial court specifically stated in its July 6, 1989, order that its finding of competency was without prejudice to appellant and in no way precluded appellant from raising issues of mental incompetence or mental responsibility at a future time in this matter.

It is appellant's contention that these records were privileged and hence not subject to discovery. He also claims that he did not waive the privilege; one because he did not offer an

insanity defense; and two because he did not submit to a court-ordered psychiatric examination. It is difficult to discern any prejudice to appellant from the Commonwealth's acquisition of these records especially given the fact that appellant's own witnesses had already testified to the contents of these reports during the competency hearing. Additionally, appellant's own witnesses testified to these records at trial. While the material may, indeed, be privileged, that privilege must surely yield where, as here, a defendant, by his own defense, puts his mental state at issue and specifically relies upon this information.[3]

## *TRIAL AND PENALTY PHASE ERRORS*

Appellant contends that he did not knowingly and intelligently waive his right to a jury trial. His argument here is twofold. Initially he submits that the trial court erred in explaining his rights under the "guilty but mentally ill" statute thereby causing him to elect to proceed non-jury. Specifically, appellant argues that the court failed to inform him that if he had elected to plead "guilty but mentally ill" and if the trial judge were to ultimately determine not to accept the plea, appellant would have been entitled to withdraw his plea and proceed to a jury trial. In so arguing appellant obviously refers to subsection (b) of the "Guilty but Mentally Ill" statute.

Subsection (b) of the "Guilty but Mentally Ill" statute, however, has no bearing whatsoever on the appellant's waiver of a jury trial after he elected to dispense with the plea and proceed to trial. Subsection (b) provides, in pertinent part, that where the trial judge refuses to accept a plea of "guilty but mentally ill," the defendant shall be permitted to withdraw his plea and proceed to a jury trial or a bench trial before a different judge. That subsection is, however, of no moment

3. We would also note that appellant also argues that the trial court erred in failing to consider testimony regarding appellant's history of mental illness. While this issue is discussed later in this opinion, we merely reference it at this point to demonstrate appellant's own reliance upon his alleged history of mental illness.

where, as here, a defendant agrees to forego tendering any such plea, waives his right to a jury trial, and then proceeds non-jury. Appellant can hardly claim that after he elected to forego his plea, his waiver of a jury trial was unknowing because the trial court allegedly failed to provide an adequate explanation of the specific plea. In essence, appellant is seeking a second bite at the apple; after voluntarily choosing to proceed to a trial, and after unsuccessfully asserting his claim of mental illness, he wants a second chance to assert his claim, this time before a different tribunal. We find no basis whatsoever in this argument to support a finding that the waiver was unknowing.

Appellant also argues that the trial court failed to properly advise him of the essential ingredients of a jury trial thereby rendering his waiver unknowing and unintelligent. For the following reasons, we find this claim to also be without merit.

■ Prior to accepting a defendant's waiver of his right to a jury trial, the trial court must conduct a colloquy wherein it apprises the defendant of the three essential elements of a jury trial: that the jury would be selected from members of the community; that the verdict must be unanimous; and that the defendant would be allowed to participate in the selection of the jury. *Commonwealth v. Williams*, 454 Pa. 368, 312 A.2d 597 (1973). As noted previously, appellant had participated in three days of jury selection prior to his tender of a plea. Clearly then, he knew how a jury was selected. Moreover, once appellant decided to tender a plea of "guilty but mentally ill," the trial court reiterated those essential aspects of a jury trial that appellant would be waiving upon entry of his plea. The trial court, again, reiterated these rights during the afternoon colloquy that took place upon the decision of appellant to proceed to a bench trial. Furthermore, appellant also signed a waiver of jury trial form, thereby specifically acknowledging that the elements of a jury trial were explained to him and that he understood such. These facts not only indicate that appellant was apprised of his right to a jury trial, but that he also knowingly and voluntarily relinquished that

right. *See, Commonwealth v. DeGeorge,* 506 Pa. 445, 485 A.2d 1089 (1984).

■ Appellant next argues that the trial court erred in refusing to consider testimony regarding appellant's history of mental illness. At trial, appellant called one Dr. Kratsa, a psychiatrist, in an effort to establish that appellant had exhibited signs of mental illness since his early childhood. However, Dr. Kratsa had never clinically evaluated appellant, nor had he ever reviewed any records pertaining to appellant's mental state. Rather, Dr. Kratsa, who was a friend of appellant's family, gained his knowledge regarding appellant's alleged history of mental illness solely from conversations he had with appellant's family members who had called Dr. Kratsa on several occasions seeking advice. The only other contact Dr. Kratsa had with appellant was during certain athletic events in which appellant participated and Dr. Kratsa coached. Moreover, Dr. Kratsa had not even seen appellant during the three year period immediately preceding the murders. Accordingly, he could not testify to appellant's mental state at, or near, the time that the murders occurred.

Throughout Dr. Kratsa's testimony, the trial court repeatedly told counsel for appellant that unless he could connect the doctor's observations to appellant's mental state at the time of the instant murders, the testimony could not be viewed as probative of the issue of whether appellant was mentally ill at the time he committed the murders. No such connection was ever made and counsel for the prosecution moved to strike Dr. Kratsa's testimony. This testimony was clearly not probative of the issue of appellant's mental state at the time of the murders and thus, was not relevant or admissible. *See, Commonwealth v. Stewart,* 461 Pa. 274, 336 A.2d 282 (1975). Nevertheless, the trial court refused to strike Dr. Kratsa's testimony, noting that if appellant could later make the requisite connection, the court would consider the testimony. The trial court, therefore, provided appellant every opportunity to establish the relevancy of this testimony. Appellant, however, failed to subsequently provide that connection. Appellant, having failed to establish the relevancy of Dr. Kratsa's testi-

mony, cannot now be heard to complain that the trial court erred in disregarding this testimony. We can find no abuse of discretion on the part of the trial court in disregarding this testimony.

Appellant also contends that the trial court erred in not finding appellant "guilty but mentally ill." Essentially, appellant argues that the trial court misapprehended the law regarding "guilty but mentally ill." In support thereof, he contends that the trial court, at the penalty hearing, found him to be under the influence of extreme mental or emotional disturbance at the time of the crime and that, therefore, the court erred in not finding him guilty but mentally ill under 18 Pa.C.S. § 314. Appellant also argues that the court improperly focused upon whether the mental illness *caused* the appellant to act as he did rather than focuses upon whether, because of the mental illness, appellant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. He then claims that the trial court's alleged error also caused the court not to find mitigating circumstance (e)(3), 42 Pa.C.S. § 9711.[4]

Recently, this Court, in *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992), noted that in a capital case, evidence tending to establish that a defendant was "guilty but mentally ill" is properly admitted only at the penalty phase. We indicated therein that in a capital case, "guilty but mentally ill" is subsumed within mitigating circumstances 9711(e)(2) and (e)(3). *Id.*, 528 Pa. at 73 n. 7, 595 A.2d at 36, n. 7. While *Faulkner* was decided after the trial of the instant case, the law regarding the use of "guilty but mentally ill" as espoused therein was an affirmation of the well established legal principle that a verdict of "guilty but mentally ill" does not address a defendant's legal responsibility for the acts committed, but

4. Subsection (e)(3) provides for a finding of a mitigating circumstance where the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

rather reflects a penological concern and therefore, is properly considered during the sentencing phase. *See, Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990) citing *Commonwealth v. Sohmer*, 519 Pa. 200, 546 A.2d 601 (1988).

Here, contrary to appellant's assertions, the trial court found during the guilt phase that appellant, at the time of the commission of the murders, was not laboring under any mental illness sufficient to deprive him of his ability to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of law. The trial judge then heard further evidence during the penalty phase regarding appellant's mental state and again reiterated his finding that the defense had not established that appellant was "guilty but mentally ill" at the relevant time. In an apparent attempt at fairness, the trial judge then found that mitigating circumstance (e)(2) could be read more liberally than the "guilty but mentally ill" statute, concluding that (e)(2) can properly be found where there is evidence that a defendant suffers from mental illness at the time of sentencing. While the trial judge's conclusion was clearly in error given the clear and unambiguous language of subsection (e)(2), this Court will not render a mitigating circumstance invalid as there has been no error resulting therefrom to the defendant.

As for appellant's claim that the trial judge should have also found mitigating circumstance (e)(3), we cannot agree. The trial court clearly found that appellant failed to suffer from the requisite degree of mental illness, if any, at the time of the offenses. Mitigating circumstance (e)(3) tracks the language of the "guilty but mentally ill" statute and thus, provides that only where the defendant lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law *at the time of the offenses* will he meet the criteria. Accordingly, because the trial judge in the instant case found no such mental impairment at the time of the instant murders, (e)(3) could not properly be found.

Accordingly, for all the foregoing reasons, we conclude that the trial court, although it may have misconstrued the verdict

of "guilty but mentally ill" in application, did not err in failing to find the appellant "guilty but mentally ill."

Appellant next contends that the trial court erred in failing to consider, as a mitigating factor, his good conduct while in prison. Appellant claims that his good behavior while in prison demonstrates character traits which are relevant mitigating evidence and therefore, should have been found under (e)(8). Specifically, he claims that his ability to peacefully adjust to life in prison and his alleged non-violent nature while in prison are relevant character traits bearing on mitigation. Appellant intimates that the trial court failed to consider these traits simply because it had already found mitigating circumstance (e)(8).

The record reveals that while appellant did, indeed, offer into evidence a document which stated that there were no written reports of misconduct on the part of appellant while he was incarcerated and that the Commonwealth did stipulate that the document contained such information, the Commonwealth nevertheless did not stipulate that there were no incidents of misconduct that did occur. Indeed, the Commonwealth called as a witness, a psychologist employed at Delaware County Prison who testified that on one particular occasion while he was making rounds he noticed that a radiator located in appellant's cell had been tampered with and that when the guards arrived to check the cell, he witnessed appellant attack the guards. Given this contradiction in the evidence, we cannot conclude that the trial court erred in finding insufficient evidence to support these alleged mitigating factors.

Appellant also contends that the sentence imposed in his case was the product of passion and prejudice. In support of his claim, appellant argues that the trial court, in weighing the aggravating and mitigating circumstances, impermissibly considered the gravity of the offense. The trial court rendered its sentence based upon its conclusion that the gravity of the offense and the aggravating circumstances outweighed the existing mitigating circumstances. Such considerations

are valid and provide no basis for a finding that the sentence imposed was the result of any prejudice or other arbitrary factor. *See, Commonwealth v. Moser,* 519 Pa. 441, 549 A.2d 76 (1988).

█ Finally, appellant argues that the sentence imposed was disproportionate to the penalty imposed in similar cases. Appellant claims that the sentence of death was disproportionate to other cases in which similar evidence of mitigation was presented. In support thereof, he relies upon information received from the Administrative Office of the Pennsylvania Courts regarding another case in which similar mitigating circumstances were allegedly presented and a sentence of life was imposed. This information sheet, which appellant has attached to his brief, lists only one defendant, Stanley Joseph Hertzog, and indicates that Hertzog was convicted of three murders for which he received a life sentence as to each murder.

In compliance with our statutory duty to review death penalty cases to determine whether the sentence imposed is excessive or disproportionate to the sentence imposed in similar cases,[5] we have conducted our own review of the data and information compiled by the Administrative Office of the Pennsylvania Courts (A.O.P.C.). *See, Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). That review has revealed that the information on which appellant has relied is inapposite for purposes of our current review insofar as the circumstances of the case involving Stanley Joseph Hertzog are not similar to those presented in the instant matter.[6]

**5.** 42 Pa.C.S. § 9711(h)(3)(iii).

**6.** First, the aggravating circumstances actually found in the case of *Commonwealth v. Stanley Joseph Hertzog,* No. 1084–1986, Court of Common Pleas, Northampton County, included: victim was a prosecution witness to a murder or other felony committed by the defendant; defendant committed a killing while in the perpetration of a felony; defendant created a grave risk of death to another person other than the victim; and, defendant has been convicted of another Federal or State offense committed either before or at time of the offense at issue for which life imprisonment or death was imposable. The information

Accordingly, we find that information of no value to us in conducting our proportionality review here. Furthermore, our independent review of all the relevant information has revealed that the sentences of death imposed in the instant matter are neither excessive nor disproportionate. Accordingly, the sentences of death must be affirmed.

For the foregoing reasons, we uphold the convictions and affirm the judgment of sentence of death.[7]

LARSEN and McDERMOTT, JJ., did not participate in the decision of this case.

we received from the A.O.P.C. also indicates that Hertzog was one of two defendants involved in that murder and that Hertzog did not do the actual killing. Thus, for purposes of our statutorily mandated proportionality review, we cannot conclude that the facts of the Hertzog case are "similar" to the facts of the instant matter.

7. The Prothonotary of the Supreme Court is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).