J-A13031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| CHRISTOPHER FREEMAN | |
| Appellant | No. 866 WDA 2013 |

Appeal from the Judgment of Sentence January 9, 2013
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0015155-2010

BEFORE:  PANELLA, J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                              **FILED JULY 30, 2015**

Christopher Freeman appeals from the judgment of sentence imposed on January 9, 2013, in the Court of Common Pleas of Allegheny County, made final by the denial of post-sentence motions on April 24, 2013.  On October 25, 2012, a jury convicted Freeman of second-degree murder, robbery of a motor vehicle, burglary, and criminal conspiracy to commit burglary.[1]  The court sentenced Freeman to an aggregate term of life imprisonment.  On appeal, Freeman claims the court erred by failing to suppress a statement he made to police and with respect to two evidentiary

---

[1]  18 Pa.C.S. §§ 2502(b), 3701(a), 3502(a), 903(a)(1), respectively.

issues.[2]   After a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm the judgment of sentence.

The facts and procedural history are as follows:   During the late evening on July 6, 2010, Freeman went over to the house of a friend, James Lyle, to hang out on the porch, play video games, and smoke marijuana. N.T., 10/23/2012, at 102.   Lyle's home is located at 3124 Sacramento Avenue, Pittsburgh, Pennsylvania in the Sheraden section of the city. The victim, Ben Lewis, was neighbors with Lyle, and his house was located at 3126 Sacramento Avenue.   He apparently approached the two men, mumbled something, and Freeman asked the victim to repeat what he had said.   *Id.* at 104.   Lyle heard the victim say "you" and "nigger."   *Id.* Freeman became visibly upset and the victim retreated to his house.   *Id.* at 105.  Freeman then left Lyle's home.  *Id.*

Several hours later, Lyle was in his dining room, at his computer, when he noticed motion-sensor lights go on at the victim's house.  *Id.* at 107.  He heard three loud bangs and looked out the window.  Lyle observed three men in dark clothing, including Freeman, standing outside the victim's

_____

[2]  Based on the nature of Freeman's claims, we have reordered them in our analysis.

home. *Id.* Freeman, who had a shirt covering the lower half of his face,[3] told Lyle, "You didn't see anything." *Id.* at 109. He then pulled a gun from his waistband, and pointed it at Lyle. *Id.* Lyle closed his blinds and went back into his dining room. *Id.* at 110. Lyle then heard the sound of both of the victim's vehicles, a red Chevy pickup truck and a blue Pontiac Sunbird, drive off. *Id.*[4]

The next morning, Lyle went to the victim's home and saw that the front door had been damaged and the air conditioning unit was hanging out the window. *Id.* at 111. He opened the door slightly and observed the victim on the ground. *Id.* at 112. He called out the victim's name, heard no response, and went back to his house to call 911. *Id.*

Detective Christine Williams of the City of Pittsburgh Police Department responded to the scene and found the victim dead, as a result of two gunshot wounds to the shoulder and chest. *Id.* at 37-38. The victim also suffered from blunt force trauma to his scalp, at the top and back of his head. *Id.* at 87. Detective Williams indicated the interior of the residence

---

[3] Lyle testified he recognized Freeman based on his hair, height, eyes, voice, and because he had on the same clothes as earlier in the evening. *Id.* at 110-111.

[4] Two other witnesses, Joyce Maust and Iesha Griffin, testified that they lived on the same street as the victim and Lyle, and they saw both of the victim's cars driving off down the street. *Id.* at 55, 66. Griffin also stated that she saw two people in the Pontiac and one person in the truck. *Id.* at 67.

- 3 -

looked like it had been ransacked, with furniture overturned, the doorjamb pulled away from the frame of the door, and a large sliding window hanging out the window frame. *Id.* at 35. Detective Williams also found three live bullet casings, and two spent bullet casings in the same room. *Id.* at 36. Police officers issued a "be on the lookout" report for the victim's two vehicles. *Id.* at 52.

That same day, Detective John Lewis was taking part in an unrelated narcotics investigation near the entrance to Sheraden Park when he observed two men standing near to a red pickup truck talking to a third man, who was behind the wheel of a blue Pontiac. N.T., 10/24/2012-10/25/2012, at 189, 192. Detective Lewis identified Freeman and Christopher Hunter as the two men standing outside the truck and the driver of the Pontiac as Marshineak Manning. *Id.* at 193-194. The detective saw Manning stop the car and talk to the two other men for a couple of minutes before driving off. *Id.* 192, 197. Freeman was taken into custody as part of that unrelated investigation. He was searched incident to arrest and a set of keys was seized. *Id.* at 200. The car and the truck were found and subsequently determined to be the victim's missing vehicles. The keys found on Freeman fit in the lock and ignition for the red truck. *Id.* at 251-253.

When the officers investigating the victim's murder learned that Freeman had been arrested near the victim's truck, they asked to speak with

him on July 8, 2010. *Id.* at 228-230. He agreed to speak without a lawyer and signed a Police Interrogation Warning Form. *Id.* at 230. During the interrogation, Freeman maintained he did not know the victim, nor was he familiar with the street where the victim lived. *Id.* When asked about the truck, Freeman said he was never with a red truck and did not know anything about a red truck. *Id.* at 231. He denied talking to anyone inside a blue Pontiac or ever being in Sheraden Park. *Id.* The investigating detective, James McGee, then asked Freeman, "'Well, if you didn't have anything to do with the red pickup truck, why did you have the keys that belonged to the red pickup truck?'" *Id.* Freeman said he had found those keys in Sheraden Park. *Id.* When confronted with the fact that he had just said that he had never been in the park, Freeman responded, "Well, I mean over by the high school." *Id.* at 232. After questioning, Freeman was not arrested for the murder.

Also during this time, Lyle did not tell the police about the events that transpired the night before because he was "scared." N.T., 10/23/2012, at 113. Shortly after the incident, Lyle said that a man approached him and threatened him not to tell police what he knew about the murder. *Id.* at 114-115. The man also told Lyle that he had to send money to post Freeman's bond for his arrest on the other charges and to put money in Freeman's "book." *Id.* at 115. Lyle paid the bond, but the threats and demands for money continued. *Id.* at 152. In mid-October 2010, tired of

the threats and demand for payments, Lyle went to the police, telling them what he knew about Freeman and the night in question. *Id.* at 118. Lyle also identified Manning as the individual that threatened him and forced him to send money to Freeman. *Id.* at 121.

Based on this evidence, Freeman was arrested for Lewis's murder on October 15, 2010. Although Freeman verbally agreed to waive his *Miranda*[5] rights, he refused to sign the Police Interrogation Warning Form, stating he was not comfortable signing the form. *Id.* at 237. With respect to the night in question, Freeman again denied any knowledge of the victim, the street where the victim lived, Lyle, and even Manning. *Id.* at 237.

Freeman's first jury trial was held on March 6, 2011 to March 13, 2011, but ended in a mistrial.[6] His second jury trial began on October 23, 2012. Two days later, the jury convicted Freeman of second-degree murder, robbery of a motor vehicle, burglary, and conspiracy to commit burglary. The jury found him not guilty of robbery (serious bodily injury) and carrying a firearm without a license.[7] On January 9, 2013, the court sentenced Freeman to life imprisonment without the possibility of parole for the murder conviction, a concurrent five-year term for the robbery charge, and a

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] The court determined a juror had conducted inappropriate internet research related to the case. *See* N.T., 3/6/2011-3/13/2011, at 491-492.

[7] 18 Pa.C.S. §§ 3701(a)(1)(i) and 6106(a)(1).

concurrent two-year term for the burglary conviction. The court imposed no further penalty with respect to the conspiracy charge. Freeman filed a post-sentence motion, challenging the jury instructions, which was denied on April 24, 2013. This appeal followed.[8]

In his first argument, Freeman claims the trial court erred in denying his motion to suppress his statements made to the police during a custodial interrogation on October 15, 2010, because he did not voluntarily, knowingly, and intelligently waive his **Miranda** rights under the totality of the circumstances. Freeman's Brief at 40. Freeman acknowledges that a waiver of rights does not have to be in writing. **Id.** at 41. However, relying on **Commonwealth v. Youngblood**, 307 A.2d 922 (Pa. 1973) and **United States v. Nielsen**, 392 F.2d 849 (7th Cir. 1968), he states that although he **verbally** waived his **Miranda** rights prior to the interrogation, his subsequent **actions** established he did not knowingly and voluntarily waive his rights. Freeman's Brief at 40. Freeman points to the following: (1) he expressed that he was "not comfortable" signing the waiver document; and (2) he denied knowing anything and answered each question in the negative. **Id.** at 47-48. He contends these circumstances should have

---

[8] On May 30, 2013, the trial court ordered Freeman to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Following several extensions of time, Freeman filed a concise statement on April 30, 2014. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on July 28, 2014.

raised a flag with the investigating detective because Freeman had previously signed the form at the July interrogation but then refused to sign the form at the October questioning. *Id.* at 48. Moreover, Freeman states he was under arrest and he was only 18 years old at the time of the October interview, which resulted in a coercive environment. *Id.* at 50-51. Freeman concludes his statements were unduly prejudicial because they were used by the Commonwealth as evidence of his consciousness of guilt. *Id.* at 52-53.

> The standard of review an appellate court applies when considering an order denying a suppression motion is well established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. **Commonwealth v. Russo**, 594 Pa. 119, 126, 934 A.2d 1199, 1203 (2007) (citing **Commonwealth v. Boczkowski**, 577 Pa. 421, 846 A.2d 75 (2004)). Where the record supports the factual findings of the suppression court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. **Id.** It is also well settled that the appellate court is not bound by the suppression court's conclusions of law. **Id.** (citing **Commonwealth v. Duncan**, 572 Pa. 438, 817 A.2d 455 (2003)). However, [w]hether a confession is constitutionally admissible is a question of law and subject to plenary review. **Commonwealth v. Nester**, 551 Pa. 157, 160, 709 A.2d 879, 881 (1998).

> Thus, this Court does not, nor is it required to, defer to the suppression court's legal conclusions that a confession or **Miranda** waiver was knowing or voluntary. Instead, we examine the record to determine if it supports the suppression court's findings of fact and if those facts support the conclusion that, as a matter of law, Appellant knowingly and intelligently waived his **Miranda** rights. Preliminarily, we note:

> > Regardless of whether a waiver of **Miranda** is voluntary, the Commonwealth must prove by a

> preponderance of the evidence that the waiver is also *knowing and intelligent*.
>
> *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.
>
> *Commonwealth v. Cephas*, 361 Pa. Super. 160, 522 A.2d 63, 65 (Pa. Super. 1987) (emphasis in original).
>
> *In the Interest of T.B.*, 2010 PA Super 197, 11 A.3d 500, 505-506 (Pa. Super. 2010).

*Commonwealth v. Knox*, 50 A.3d 732, 746 (Pa. Super. 2012), *aff'd*, 105 A.3d 1194 (Pa. 2014).[9]

---

[9]

> The trial court must assess the voluntariness of a confession based on the totality of the circumstances, looking at the following factors: (1) the duration and means of interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) "any and all other factors that could drain a person's ability to withstand suggestion and coercion."

*Commonwealth v. Harvey*, 812 A.2d 1190, 1198-1199 (Pa. 2002), *quoting Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998). *(Footnote Continued Next Page)*

In **Commonwealth v. Bomar**, 826 A.2d 831 (Pa. 2003), *cert. denied*, 540 U.S. 1115 (2004), the Pennsylvania Supreme Court reviewed its prior holdings in **Commonwealth v. Bussey**, 404 A.2d 1309 (Pa. 1979) (plurality), and **Commonwealth v. Hughes**, 639 A.2d 763 (Pa. 1994), regarding the requirement of an explicit waiver of **Miranda** rights.   In **Bomar**, the Supreme Court departed from **Bussey** and its progeny, indicating it was not a majority opinion and therefore, it did not constitute binding precedent.   **Bomar**, 826 A.2d at 883, n.13.   Instead, the **Bomar** court set forth the following:

> An explicit statement of waiver after being advised of [one's] **Miranda** rights … is not necessary to a finding of waiver under the Fifth Amendment. The pertinent question is whether the defendant in fact knowingly and voluntarily waived the rights delineated in the **Miranda** case. Waiver can be clearly inferred from the actions and words of the person interrogated.

**Id.** at 843 (citations and quotations marks omitted).

Subsequently, in **Commonwealth v. Baez**, 21 A.3d 1280, 1286 (Pa. Super. 2011), *appeal denied*, 37 A.3d 1193 (Pa. 2012), a panel of this Court reiterated the holding in **Bomar** that an explicit statement of wavier of **Miranda** rights is not required.   Further, this Court explained, "[A]fter a defendant is given his or her **Miranda** rights, a statement by the defendant

*(Footnote Continued)* ————————————

"Moreover as factfinder, it is within the suppression court's sole province to pass on the credibility of witnesses and the weight to be accorded their testimony.   The factfinder is free to believe all, some, or none of the evidence presented." **Commonwealth v. Griffin**, 785 A.2d 501, 505 (Pa. Super. 2001) (citations omitted).

- 10 -

that he understands those rights followed by the answering of questions posed by the interrogating officer constitutes a sufficient manifestation of a defendant's intent to waive those rights so as to satisfy state constitutional protections." *Baez*, 21 A.3d at 1286.[10]

Turning to the suppression hearing, which occurred prior to Freeman's first trial, Detective MeGee testified to the following:

Q. And when you arrested [Freeman], what did you do then?

A. He was brought to our office, and once he was at the office, he was informed that he was under arrest for the murder of Ben Lewis, and at that time we presented him with a preinterrogation warning form. This form explains his rights to an attorney, and if he wants to talk to us without an attorney.

Once the form was read to Mr. Freeman, he answered "yes" to the four questions, and then the form was given to him to read and then to sign it.

---

[10] In *Baez*, *supra*, the trial court held the defendant had not expressly waived his rights because (1) the police did not ask him if he was willing to waive his rights, and (2) he did not execute a written waiver of his rights. On appeal, this Court followed the pronouncement in *Bomar* and concluded:

[N]either of these factors is a prerequisite for finding that a defendant has expressly waived his or her rights. The only difference between *Bomar* and the case before us is that in *Bomar*, the defendant twice indicated that he understood his rights whereas here, Defendant indicated so only once and then proceeded to answer the officer's questions. We are satisfied that this too constitutes a sufficient manifestation of an intent to waive one's *Miranda* rights.

*Baez*, 21 A.3d at 1286.

After Mr. Freeman read the form, he said he wasn't comfortable with signing the form, but he was willing to talk to us without an attorney.

…

Q.   Detective McGee, how did you go about explaining to [Freeman] his constitutional rights?

A.   The rights were read off of the form.  I went over each question, word for word, to Mr. Freeman, and at the end of each question I asked if he understood it and he said he did.  At that point he answered "yes."

We went to the next question.  Same thing.  Read the question to him, he answered "yes" to all four questions, and then I said, after [I] was done reading the form to him, the form was given to Mr. Freeman to read it himself and once he read it I told him I needed him to sign it.  He stated he was willing to speak to us without an attorney, but he wasn't comfortable with the signing.

Q.   The final question in the series of questions that:  Knowing these rights, are you willing to waive your right and answer questions without the presence of a lawyer?

A.   That is correct.

Q.   And how did he respond?

A.   He said, yes, he was.

Q.   And you wrote that on your form?

A.   Yes.

Q.   And then where he was asked to sign his signature you wrote "refused?"

A.   That is correct.

Q.   Was he then agreeable to talking to you about what you wanted to interview him about?

- 12 -

A. Yes, he was.

Q. Were any threats or promises made to him to induce him to waive his right?

A. No, ma'am.

Q. Now, you had previously interviewed him a couple months earlier; is that right?

A. That is correct.

Q. And did he on that occasion also waive his rights as explained to him on that form?

A. He did.

Q. Did he appear to be clear headed and not under the influence of any substances?

A. Yes, ma'am.

N.T., 3/6/2011-3/13/2011, at 5-8. Furthermore, on cross-examination, the following exchange took place:

Q. What did you take his refusal to mean?

…

[A]. That he was willing to speak with us without an attorney, but he didn't want to sign the form. He knew his rights, and knowing his rights, he was willing to speak to us without an attorney, but he didn't want to sign the form.

Q. Did the thought even occur to you, Detective, that by refusing to sign the form, he was indicating he wasn't willing to execute an official waiver of his rights?

A. No, sir.

Q. By the way, the substance of that statement from October 15th, would it be fair to say that there were no admissions in that statement?

- 13 -

A.  I mean, he admitted – Well, he said he knew nobody.  He didn't know anything about it.  He didn't admit to anything, but he denied everything.

Q.  He denied everything?

A.  That is correct.

Q.  He didn't make any affirmative confession to committing the offense?

A.  That is correct.

*Id.* at 10-11.

In denying Freeman's motion to suppress, the trial court found the following:

> On March 2, 2012, the Friday before jury selection was to begin on Monday, Freeman's lawyer filed a 4 sentence motion to suppress.  He sought to exclude an alleged statement homicide detectives obtained from Freeman after his arrest on October 15, 2010.  Freeman claimed his statement was not a "knowing, intelligent and voluntary decision".  To rebut this assertion of illegality, the government solicited the testimony from the homicide detective who spoke with Freeman.  He was the only witness.  His testimony consumed a mere 10 pages of transcript.  [Detective] McGee told the Court he arrested Freeman pursuant to a warrant.  He brought Freeman to the police station and read him a listing of rights that Freeman had.  After each question, Freeman said "Yes".  The form was then handed to him.  McGee testified it appeared as if Freeman read the form.  Then Freeman said he wasn't comfortable signing the form but he was willing to talk without an attorney.
>
> The unique factual nugget from this case is that this was not the first time Freeman spoke with police about this matter.  He was questioned on July 7, 2010.  On that occasion, Freeman had no problem signing the form.  Here, on October 15th, he did not sign the form.  The defense attempts to use the juxtaposition of these two polar opposite facts as contributing to

- 14 -

Freeman not waiving his rights as set forth in the *Miranda v. Arizona* decision.

…

The government, through the testimony of [Detective] McGee, discharged its burden.[7] [Detective] McGee read the warnings to Freeman and he received an affirmative answer after each one. Freeman was then provided the opportunity to read the form. By all appearances he did. When asked to sign the form memorializing his oral answers, he chose not to. But, in conveying his unwillingness to sign the form, he said he was willing to speak to law enforcement without an attorney. These facts, when viewed through the lens of precedent, show no error by this Court in denying the request to suppress. *See*, Commonwealth v. Baez, 21 A.3d 1280 (Pa. Super. 2011), *reargument denied*, 2011 Pa. Super. LEXIS 2220, *appeal denied*, 2012 Pa LEXIS 77 (Pa. 2012)("[A]fter a defendant is given his or her *Miranda* rights, a statement by the defendant that he understands those rights followed by the answering of questions posed by the interrogating officer constitutes a sufficient manifestation of a defendant's intent to waive those rights so as to satisfy state constitutional protections."), *citing*, Commonwealth v. Bussey, 404 A.2d 1309 (Pa. 1979); Commonwealth v. Hughes, 639 A.2d 763 (Pa. 1994) and Commonwealth v. Bomar, 826 A.2d 831 (Pa. 2003).

[7] The Court notes Freeman's simplistic motion fails to raise a state constitutional claim. In fact, there is no mention of any constitutional provision that was violated. The only level of specificity comes in the [Statement of Errors], III. Nevertheless, the Court views Freeman's claim as raising a 5th Amendment violation only.

Trial Court Opinion, 7/28/2014, at 3-5 (record citations omitted).

We agree with the court's finding. Upon careful review of the record and precedent, we conclude Freeman manifested an understanding of his *Miranda* rights and a desire to waive them, despite not signing the waiver document. As Detective McGee testified, he gave Freeman his *Miranda*

warnings and Freeman orally agreed to waive those rights and speak to the detective without an attorney present. While Freeman indicated he was "uncomfortable" signing the waiver document, he did not express that he was "uncomfortable" speaking without an attorney. Likewise, during the entire interrogation, Freeman never stopped the questioning or indicated that he might want to talk to an attorney. Moreover, Freeman did not appear to be under the influence of drugs or alcohol, did not argue that the police threatened him in any way, and had prior contact with the police based on the July interview. It also bears emphasizing that Freeman did not make an affirmative confession, in that he denied all knowledge and involvement related to the events on the night in question. As such, one can reasonably conclude Freeman's decision to waive his *Miranda* rights was voluntarily, knowingly and intelligently made.[11]

Furthermore, we find Freeman's reliance on *Nielsen* and *Youngblood* is misplaced. In *Nielsen*, the defendant was arrested and charged with aiding and abetting the transportation in interstate commerce of a stolen

---

[11] *See also Commonwealth v. Cohen*, 53 A.3d 882 (Pa. Super. 2012) (finding defendant's conduct during his first interrogation with the police manifested an understanding and valid waiver of his *Miranda* rights when he freely spoke to the investigating detective based on the following: (1) he had prior experience with the criminal justice system; (2) his behavior during the first interrogation demonstrated his recognition and invocation of his rights; (3) he refused to answer when the detective asked him if he understood his *Miranda* rights, thereby acknowledging his right to remain silent; and (4) he ended the interrogation when he no longer wished to talk).

motor vehicle which he knew was stolen, in violation of 18 U.S.C. §§ 2, 2312. He was then given **Miranda** warnings twice, first at his house and then at the F.B.I. office. **Nielsen**, 392 F.2d at 851. The defendant read a statement of these rights, which were contained in a "waiver of rights" form. "According to the agent, the defendant then said: 'I am not going to sign this document. I have an attorney, * * * and I am not signing anything, including this form, until I have occasion to talk to [my attorney].'" **Id.** The agent then "offered to let the defendant call his attorney, but the defendant declined, saying, 'it could wait until later on in the morning.'" **Id.** The defendant then told the agent that the questioning could proceed. **Id.** Following this statement, the agent said that he asked the defendant five questions concerning his knowledge about another suspect and the stolen car. "To all questions, the defendant gave negative answers." **Id.** On appeal, the United States Court of Appeals for the Seventh Circuit reversed, stating:

> Here the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion. However, no further inquiry took place. In the absence of such an inquiry, we are compelled to conclude that the defendant's negative responses to the questions asked him were not made after a knowing and intelligent waiver of his rights. Consequently, the trial court erred in admitting the testimony of the subsequent interrogation.

*Id.* at 853.

In *Youngblood*, the defendant was charged with murdering his sister's husband. While in custody, he was given the standard *Miranda* warnings and at that time, he said he did not wish to say anything until he had talked with his sister. *Youngblood***,** 307 A.2d at 924. After the defendant's sister was brought into the room, the warnings were re-read to the defendant. The defendant indicated he wanted an attorney and the questioning stopped. The sister then left, stating she would return with an attorney. Several minutes later, "a detective entered the interrogation room where the defendant had been left alone and began to fill out an 'intelligence summary' consisting of the defendant's name, age, address, employment, and other background information of general nature. After answering two or three questions on the form, the defendant told the detective he wanted to recount everything that had happened." *Id.* He said "the only reason he had not done so sooner was in order to satisfy his sister, who was concerned and tired, so that she would return home and rest." *Id.* Without a further reading of the *Miranda* warnings, the defendant confessed to killing his brother-in-law. On appeal, citing *Nielsen*, the Pennsylvania Supreme Court reversed and granted a new trial based on the following:

> [Defendant], a 15-year-old youth "of mildly defective intelligence", had been in police custody for several hours and was the prime suspect in the murder of his brother-in-law. He had already once elected to remain silent and to have his sister seek to find an attorney. When he suddenly changed his mind

- 18 -

and exhibited a willingness to talk, the police should have been alert to the danger of accepting a statement without making as certain as possible that the suspect understood his rights and wished to waive them.… Whatever positive inference concerning appellant's comprehension of his rights can be drawn from his initial choice to remain silent and to seek the services of an attorney is undermined by the complete change of face which came only a few minutes later. While it is true that the reversal of defendant's position was initiated by him, his explanation that his sister was tired and that he only wanted her to go home hardly suffices as proof of a knowing and intelligent waiver of constitutional rights.

*Id.* at 927. Unlike the defendants in **Nielsen** and **Youngblood**, Freeman never invoked his right to stop the interrogation by requesting an attorney at any point during the questioning. Accordingly, both cases are factually distinguishable from the present case. Therefore, Freeman's first argument fails.

In his second argument, Freeman claims the trial court abused its discretion by prohibiting defense counsel from impeaching Lyle with evidence that in 2008, Lyle was convicted of aggravated assault and criminal solicitation to rape and murder his own mother. Freeman's Brief at 24. Freeman states:

While not classified as a *crimen falsi* conviction, this evidence nevertheless should have been admitted to impeach Lyle's testimony that he did not immediately disclose to police what he had seen out of a fear for his family's safety. Additionally, such evidence would have bolstered the defense's argument that Lyle possessed an ulterior motive for eventually coming forward to police.

*Id.* Moreover, Freeman asserts:

- 19 -

Lyle "opened the door" to questions regarding his alleged concern for his family members when he repeatedly volunteered this information to explain why it took him three-months to speak to police. Because any definition of "family" would include one's mother, Lyle's alleged concern for his family would have been directly called into question by his conviction for soliciting the rape and murder of his own mother.

*Id.* at 29-30. Additionally, Freeman argues the evidence shows that Lyle may have feared that the police would suspect him in connection with the victim's death and test for the presence of his DNA at the scene. *Id.* at 31.

We begin with our well-settled standard of review:

"Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion." *Commonwealth v. Russell*, 2007 PA Super 376, 938 A.2d 1082, 1091 (Pa. Super. 2007). An abuse of discretion is not merely an error of judgment; rather, discretion is abused when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1076 (Pa. 2002).

*Commonwealth v. Trinidad*, 96 A.3d 1031, 1036 (Pa. Super. 2014), *appeal denied*, 99 A.3d 925 (Pa. 2014).

Impeachment evidence is evidence which is presented as a means of attacking the witness' credibility. There are several principal ways to attack a witness' credibility: evidence offered to attack the character of a witness for truthfulness, evidence offered to attack the witness' credibility by proving bias, interest, or corruption, evidence offered to prove defects in the witness' perception or recollection, and evidence offered to contradict the witness' testimony.

- 20 -

***Commonwealth v. Palo***, 24 A.3d 1050, 1055-1056 (Pa. Super. 2011)

(citation omitted), *appeal denied*, 34 A.3d 828 (Pa. 2011).

Pennsylvania Rule of Evidence 609 addresses impeachment of a witness by evidence of a conviction, in pertinent part, as follows:

Rule 609. Impeachment by evidence of conviction of crime

**(a) In General.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.

Pa.R.E. 609(a). Moreover, Pennsylvania Rule of Evidence 608 governs evidence regarding a witness's character for truthfulness or untruthfulness and provides:

Rule 608. A Witness's Character for Truthfulness or Untruthfulness

**(a) Reputation Evidence.** A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked. Opinion testimony about the witness's character for truthfulness or untruthfulness is not admissible.

**(b) Specific Instances of Conduct.** Except as provided in Rule 609 (relating to evidence of conviction of crime),

(1) the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct; however,

(2) in the discretion of the court, the credibility of a witness who testifies as to the reputation of another witness for truthfulness or untruthfulness may be attacked by cross-examination concerning specific instances of conduct (not including arrests)

- 21 -

of the other witness, if they are probative of truthfulness or untruthfulness; but extrinsic evidence thereof is not admissible.

Pa.R.E. 608. Lastly, we are also guided by the following:

"Even if a crime would not in and of itself be *crimen falsi*, we would consider it as such if it was committed in part through the use of false written or oral statements." **Commonwealth v. Vitale**, 445 Pa. Super. 43, 664 A.2d 999 (Pa. Super. 1995), *appeal denied*, 544 Pa. 607, 674 A.2d 1071 (1995).

Additionally, "Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish the witness' motive for testifying." **Commonwealth v. Robinson**, 507 Pa. 522, 526, 491 A.2d 107, 109 (1985). "A witness may be cross-examined as to any matter tending to show the interest or bias of that witness." **Commonwealth v. Nolen**, 535 Pa. 77, 83, 634 A.2d 192, 195 (1993). "It is particularly important that, where the determination of a defendant's guilt or innocence is dependent upon the credibility of a prosecution witness, an adequate opportunity [must] be afforded to demonstrate through cross-examination that the witness is biased." **Commonwealth v. Birch**, 532 Pa. 563, 566, 616 A.2d 977, 978 (1992).

**Commonwealth v. Hyland**, 875 A.2d 1175, 1186 (Pa. Super. 2005),

*appeal denied*, 890 A.2d 1057 (Pa. 2005).

Here, the trial court found the following:

Before cross-examination of Lyle began, the jury was removed. Defense counsel sought permission to cross-exam Lyle about a 2008 conviction for aggravated assault and solicitation to commit assault, rape and murder. The supposed victim of those crimes was his mother, according to the proffer. The government's response referenced the Court's prior ruling in the first trial that ended in a mistrial. That ruling did not take place during the first trial but during resolution of some oral motions in limine. The government's opposition was two-fold. This crime does not denote dishonesty or false statement and thus Rule 609 excludes it. The government also argued, alternatively, that Rule 608 prohibits specific instances of conduct to impeach.

- 22 -

Case law interpreting Pa.R.E. 609 has ruled a conviction for aggravated assault is not a crime denoting dishonesty or false statement. <u>Commonwealth v. Burton</u>, 417 A.2d 611, 613-614 (Pa. 1980) ("Assault with intent to kill and murder are not [crimen falsi] crimes.[" ]); <u>Commonwealth v. Grimm</u>, 378 A.2d 377, 380 (Pa. Super. 1977) ("[C]onvictions showing assaultive or disorderly conduct do not involve false statement or dishonesty. They are completely irrelevant to the issue of the witnesses' veracity. It was, therefore, improper for the court to allow this form of impeachment."); <u>Commonwealth v. Bracey</u>, 831 A.2d 678, 682 (Pa. Super. 2003) ("[W]e detect no basis upon which to find that the trial judge erred or abused his discretion in refusing to allow defense counsel to cross examine the victim about his prior conviction for aggravated assault."); <u>Commonwealth v. Moore</u>, 715 A.2d 448, 452 (Pa. Super. 1998) ("[B]ecause Moore's previous aggravated assault conviction is not in the nature of crimen falsi and does not fall within the exceptions related to other crime evidence, the Commonwealth could not have introduced this conviction."). Lyle's conviction is not a crime denoting dishonesty or false statement and was properly excluded under Rule 609.

This past event in Lyle's life is also excludable under Rule 608(b)(1). That Rule prohibits attacking a witness's character for truthfulness with extrinsic evidence of specific instances of conduct. What Freeman wanted to do here was directly at odds with this rule. This Court acted consistent with Pennsylvania law when it prevented Freeman from cross-examining this witness on his prior conviction for aggravated assault and solicitation to commit assault, rape and murder. <u>Commonwealth v. Hanible</u>, 30 A.3d 426, 456 (Pa. 2013) ("Pa.R.E. 608(b)(1) precludes attacks upon the character of a witness based upon specific instances of conduct of the witness.").

Trial Court Opinion, 7/28/2014, at 7-9 (record citations and footnotes omitted).

We again agree with the trial court's rationale. The court properly concluded that pursuant to Rule 609 Lyle's prior convictions were inadmissible because aggravated assault and solicitation to commit assault,

rape and murder are not crimes involving dishonesty or false statement. **See** Pa.R.E. 609; **see also Commonwealth v. Patterson**, 91 A.3d 55, 68-69 (Pa. 2014), *cert. denied*, 135 S. Ct. 1400 (U.S. 2015). Likewise, pursuant to Rule 608, specific instances of his conduct, other than *crimen falsi*, were also inadmissible. **See** Pa.R.E. 608. Accordingly, we find that the trial court did not err when it refused to admit evidence of the witness's prior convictions.

Furthermore, any error would have been harmless[12] because as Freeman points out in his brief, he was able to cast doubt on the credibility of Lyle's story by establishing that Lyle failed to implicate Freeman before the alleged threats began and after the threats ended, and by eliciting testimony that the victim and Lyle had an altercation a day or two before the incident. **See** Freeman's Brief at 30-31. Likewise, as Freeman indicates,

---

[12]

> An error is harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. An error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless. Thus, 'for a reviewing court to conclude that an error is harmless, it must be convinced beyond a reasonable doubt that the error did not contribute to the verdict.' The burden of establishing that an error is harmless *beyond a reasonable doubt* rests with the Commonwealth.

**Commonwealth v. Rush**, 605 A.2d 792, 794 (Pa. 1992) (citations omitted; italics in original).

evidence of Lyle's *crimen falsi* convictions were introduced, including his 2004 federal conviction for access device fraud,[13] which would have also impeached his credibility.[14]   Moreover, of great importance, Lyle did not testify that the threats were specifically about his mother; rather he stated the initial threat was "[Manning] knows where my family is."   N.T., 10/23/2012, at 114.   Indeed, we find Lyle's convictions involving his mother are irrelevant because Manning threatened Lyle with harm to his entire family, and Lyle paid the money to protect them.   Therefore, the probative value of evidence did not outweigh the prejudicial effect.   Accordingly, Freeman's second argument fails.

In his final argument, Freeman complains the court abused its discretion by prohibiting defense counsel from impeaching Lyle with evidence that he knowingly submitted a fraudulent letter to a United States District Court judge, Alan N. Bloch, during a supervised release hearing in 2006.   Freeman's Brief at 35.   By way of background, and as stated above, Lyle was convicted in 2004 for the federal crime of access device fraud.   He was sentenced to a term of incarceration followed by a period of supervised release.   At a December 13, 2006, supervised release hearing, it was purported that Lyle submitted a fraudulent letter from his employer.   The

_____

[13]   N.T., 10/23/2012, at 122, 154-157.

[14]   **See** Freeman's Brief at 33-34.

federal court revoked Lyle's supervised release and sentenced him to a period of two years' incarceration. N.T., 3/6/2011-3/13/2011, at 33-34. Freeman submits that although the fraudulent letter incident is not a conviction *per se*, it was the functional equivalent of a conviction, considering it was an act of dishonesty under oath and, therefore, satisfies the purpose under Rule 609 as an extension of his underlying initial *crimen falsi* conviction. *Id.* at 37-39.

We are guided by the evidentiary standard of review and rules as set forth above. The trial court pointed out that the evidence at issue was raised prior to the first trial but was not discussed at the second trial. Trial Court Opinion, 7/28/2014, at 5-6. While the court did not find waiver, it did opine:

> With waiver surely lurking in the weeds, the exclusion of this evidence was a basic application of Pa.R.E. 609. Subsection (a) says that evidence "that the witness has been convicted of a crime … must be admitted if it involved dishonesty or false statement." Pa.R.E. 609(a). Lyle was not <u>convicted</u> of a crime arising from his supervised release hearing. Without the underlying conviction, the Rule 609 door is shut and will not open for Freeman.

*Id.* at 6 (emphasis in original).

We agree with the trial court. Regardless of waiver, it is apparent this letter did not result in a conviction. Rather, it was an improper act that led to Lyle's parole being revoked on an underlying crime, and evidence of the underlying conviction already was admitted. *See also Commonwealth v. Treadwell*, 911 A.2d 987, 990-991 (Pa. Super. 2006) (noting Pennsylvania

Rule of Evidence 609(b) was modeled after and differs only slightly from Federal Rule of Evidence 609(b), and that the "federal courts have determined Federal Rule 609(b) does not equate probation or parole with confinement."). Therefore, the court did not abuse its discretion in excluding this evidence. Accordingly, Freeman's final argument fails.

Judgment of sentence affirmed.


Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date:7/30/2015